## DICKERSON LUMBER CO., INC. *v.* HERSON ᴇᴛ ᴜx.

[No. 95, September Term, 1962.]

*Decided January 30, 1963.*

The cause was argued before Bʀᴜɴᴇ, C. J., and Hᴇɴᴅᴇʀsᴏɴ, Hᴀᴍᴍᴏɴᴅ, Hᴏʀɴᴇʏ and Sʏʙᴇʀᴛ, JJ.

*Robert E. Bullard* for appellant.

*James C. Christopher,* with whom was *Charles W. Prettyman* on the brief, for appellees.

BRUNE, C. J., delivered the opinion of the Court.

The plaintiff-appellant, Dickerson Lumber Co., Inc., (the Lumber Company) filed a bill in the Circuit Court for Montgomery County against the defendants-appellees, Nathaniel and Anita Herson, to foreclose a mechanic's lien for materials furnished to a builder, Marson, Incorporated (Marson), for the construction of a house for the defendants. The Circuit Court dismissed the bill and the Lumber Company appeals.

The Hersons entered into a contract dated March 2, 1959, with Marson for the construction of a residence located on what was then known as Woolsey Court at a cost of $39,340.00. The price was to be payable in instalments as the work progressed. The Hersons also arranged for a construction loan of $25,000.00 from Liberty Savings and Loan Association, which was to be disbursed in instalments as the work progressed. To obtain this loan the Hersons, as principals, and George McKenzie and Wayne Dickerson, as sureties, executed a completion bond dated March 17, 1959, in the amount of $25,000.00 running to the treasurer of the Association and his successors in office. Under it they undertook that the house would be completed within six months and that within six months after its completion the premises would be free of liens for work, labor, services or materials furnished in connection with the construction of the house. Dickerson was the president and McKenzie was the secretary and treasurer of the Lumber Company, and the two of them owned the Company. The Lumber Company had done business with Marson in the past, and at the time the bond was executed Marson owed the Lumber Company nearly $6,000.00. $2,000.00 was paid by Marson on April 24, 1959, the source of which does not appear from the record before us. McKenzie's and Dickerson's reasons for executing the Herson construction bond are not clearly stated (if stated at all) in the testimony. Doubtless they intended and expected the Lumber Company to get the business of furnishing the lumber and millwork for the Her-

son house (as it did), and it is readily inferable that they wished to help their customer and debtor Marson, and particularly that they wished to help Marson to pay its debts to the Lumber Company.

The first delivery of materials for the Herson job was made by the Lumber Company on April 23 and the last on October 20, 1959. The Lumber Company did not segregate on its ledger sheets billings to Marson for the three construction projects for which it was furnishing lumber or other materials. The ledger sheets show, in addition to the amounts of invoices, some advances by the Lumber Company to Marson for payroll or other purposes. They also show some payments received, without allocating them to specific jobs. On October 20, 1959, the account shows a balance due the Lumber Company of $7,524.93. All of this was charged against the Hersons. According to the account filed with the lien this amount represents the difference between total billings (after credits for returns) against the Herson job and what are described as "Receipts Applicable to above [total billing]" of $781.21. These receipts are not itemized in the account. The testimony indicates that the Lumber Company applied all monies derived from the Herson loan (in the manner described below) to the payment of Marson's indebtedness on two other jobs until they were discharged and then applied the balance to the Herson account.

There were five disbursements of the construction loan. The first four were made by checks of the Savings and Loan Association dated, respectively, May 4, May 15, June 10 and August 18, 1959. Each of the first three was for $2,500.00; the fourth was for $5,000.00. The first and third checks were payable to the two Hersons and McKenzie *and* Dickerson; the second and fourth were payable to the two Hersons and McKenzie *or* Dickerson. Each of these checks was first endorsed by the two Hersons, the first three were also endorsed by both McKenzie and Dickerson, the fourth by Dickerson. All four were endorsed for deposit by Marson, were turned over to Marson, and were deposited in Marson's bank account. Mr. McKenzie testified that the Lumber Company re-

ceived from Marson between $8,500.00 and $9,000.00, between the date when the Herson job started and October 30, 1959, of which $3,500.00 was received before the first "draw" on the Herson loan. It also appears that only $781.21 was credited against materials delivered for the Herson house. There is also no dispute that in May, 1959, Marson gave the Lumber Company a bad check for $1,500.00, and that on August 18, 1959, the Lumber Company advanced $175.00 to Marson to meet a payroll. The appellant asserts the right to apply all payments received from the debtor, Marson, in the absence of contrary instructions from the debtor (and none are shown) to any indebtedness due to it from Marson; and the appellant seeks to assert a mechanic's lien for the balance left unpaid on the Herson job after its application of these payments to other indebtedness of Marson. The appellees contend that the Lumber Company actually had control of the total amount of $12,500.00 represented by the first four checks, and that it thus either received payment for the entire amount of its claim or else that it waived or is estopped to assert a mechanic's lien when it could and should have applied these monies to the payment of its claim.

The appellant claims that the fifth "draw" under the Herson construction loan payable when the trim was in, which amounted to $7,500.00 and was made on October 30, 1959, should have been used to pay the balance of the Marson indebtedness to the Lumber Company for materials for the Herson house. The check for this "draw" was payable only to the Hersons and it never came into the possession of the Lumber Company or its officers. We do not agree with this contention of the appellant. There was no agreement that this advance should be used to pay for lumber, trim or any other specific materials. The contract between the Hersons and Marson and the construction loan contemplated payments on account of the contract price and disbursements of the loan as construction work progressed.

The special position of the Lumber Company and its officers in this matter gave the Lumber Company ample opportunity to protect itself against loss on the Herson job for all

amounts due up to August 18, 1959. It seems patent that the officers, McKenzie and Dickerson, were acting on behalf of the Company. It further seems clear that these officers and the Company through them knew the source of funds paid to the Lumber Company by Marson out of the proceeds of the first four "draws" under the construction loan. At the time of the first "draw" of $2,500.00 on May 4, Marson's purchases of material from the Lumber Company for the Herson job aggregated $2,280.33. Not a cent of the Herson money appears to have been applied to this indebtedness. On the contrary, whatever part of that money was paid by Marson to the Lumber Company was applied to other accounts. Similarly, at the time of the second "draw", May 15, charges against the Herson job had increased to $4,138.37, and at the time of the third "draw", June 10, to $5,621.61, and the fourth, on August 18, to $6,147.89. All charges against the Herson job up to the dates of each of the several draws would have been paid in full if the Herson money had been applied first to that purpose.

The Mechanic's Lien Law seeks to protect materialmen who are not in a position to protect themselves if the owner negligently pays the contractor without first ascertaining that the materialmen have been paid. *Bounds v. Nuttle,* 181 Md. 400, 30 A. 2d 263; *Johnson Lumber Co. v. Magruder,* 218 Md. 440, 147 A. 2d 208; *Reisterstown Lumber Co. v. Reeder,* 224 Md. 499, 168 A. 2d 385. That situation is not present here; the Lumber Company obviously had means of protecting itself up to and including August 18, 1959. By August 18, 1959, the Lumber Company must have known of Marson's serious financial condition not only from the bad check given in May, but also from the need to make a payroll advance to Marson of $175.00 on that very day, August 18. Marson must then have been in precarious condition. In addition, Mr. Herson had complained to Mr. Dickerson that the contract was not completed and that the house was far behind schedule. Mr. Dickerson had agreed to attend a conference about the situation, but he failed to appear at the appointed time and place. Despite the danger signals, the Lumber Company made no

visible effort to protect itself on the Herson job; on the contrary, it turned over the $5,000.00 check of August 18th to Marson, even though according to its own records Marson then owed it over $6,000.00 on the Herson job. Our views are strengthened by the provisions of the completion bond affording protection against mechanics' liens, even though the Lumber Company itself was not a party to the bond and the owners were not the obligees. Cf. *Pinning v. Skipper,* 71 Md. 347, 352, 18 A. 659.

We think that it was clearly the duty of the Lumber Company and of its officers to apply funds received by the Lumber Company from Marson known to have been derived from the Herson payments to the payment of charges against the Herson job then due rather than to apply such amounts to the payment of other indebtedness of Marson to the Lumber Company. To the extent of such indebtedness we think it clear that the Lumber Company is estopped to assert a lien against the Hersons' property. *Crane Co. v. Onley,* 194 Md. 43, 69 A. 2d 903. See also *Goldman v. Brinton,* 90 Md. 259, 44 A. 1029 (estoppel by oral agreement against setting up a mechanic's lien to the loss of other creditors who relied thereon). And see *T. Dan Kolker, Inc. v. Shure,* 209 Md. 290, 121 A. 2d 223, with regard to the allocation of payments.

There remains for consideration a balance of $2,158.25, representing the difference between total charges (less credits for returns) of $8,306.14 and the $6,147.89 covering charges through August 18, 1959. We cannot tell from the record before us just when the amounts aggregating $781.21 which were credited to the Herson job account were received by the Lumber Company. If the date or dates were subsequent to August 18, 1959, the net amount still in question would be reduced to $1,377.04. We have noted that of the $8,500.00 to $9,000.00 admittedly received by the Lumber Company from Marson after work started on the Herson job and prior to October 30, 1959, some $3,500.00 was apparently received before the first disbursement was made under the Herson construction loan. We, therefore, cannot say that more Herson loan money actually found its way through Marson into the

bank account of the Lumber Company than the aggregate amount of the charges of $6,147.89 which had accrued on the Herson job up to August 18. Though it is the contention of the appellees that estoppel should apply to the full amount of $12,500.00 over which the Lumber Company might have exercised control, we do not think that the Lumber Company was in a position in effect to enforce a lien thereon for future indebtedness to it to be incurred by Marson for materials to be used in the Herson job. To have done so would have involved a departure from the schedule of progress payments to the builder contemplated under the building contract which were synchronized with disbursements under the construction loan agreement. The latter, as we have held above in connection with a contention of the Lumber Company, were based upon the stages of construction and were not allocated to the payment of the claims of any particular materialmen. We think that the rule works both ways and that a hold-back for the future supplies to be furnished by a particular materialman was not contemplated either.

It follows from the views above expressed that the appellant is not entitled to a lien for any materials furnished up to and including August 18, 1959. We cannot determine from the record for what amount it may be entitled to assert a lien for materials furnished after that date. Accordingly, the order of the Circuit Court is affirmed insofar as it denied a lien for any materials furnished up to and including August 18, 1959, and is reversed and the case is remanded for the determination of the amount of the appellant's claim for any materials furnished after that date less any claims or credits properly allowable against the same.

> *Order affirmed in part and reversed in part and case remanded for further proceedings not inconsistent with this opinion; the costs of this appeal to be paid three-fourths by the appellant and one-fourth by the appellees.*