551 A.2d 888

**AMI OPERATING PARTNERS LIMITED PARTNERSHIP, et al.**

v.

**JAD ENTERPRISES, INC. t/a Fairmount Mill and Lumber Company.**

**No. 544, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Jan. 9, 1989.

Certiorari Denied March 8, 1989.

656

658

Peter E. Lind (Taub & Taub, Fairfield, N.J., Robert J. Prout, David M. Stern and Rosenberg, Proutt, Funk & Greenberg, on the brief), Baltimore, for appellants.

Charles Yumkas, Thomas A. Bowden and Blum, Yumkas, Mailman, Gutman & Denick, P.A., Baltimore, for amicus curiae, American Subcontractors Ass'n of Baltimore, Inc.

Steven J. Fox (Weinberg and Green, on the brief), Columbia, for appellee.

Argued before MOYLAN, WILNER and ALPERT, JJ.

WILNER, Judge.

The Circuit Court for Anne Arundel County declared that appellee (Fairmount) was entitled to a mechanics' lien in the amount of $50,664.75 on certain property comprising the Holiday Inn at Baltimore–Washington International Airport. The related business entities that own, lease, and manage that hotel, to whom we shall collectively refer as AMI, appeal that decision, complaining that:

I. The Maryland mechanics' lien law is unconstitutional because it

(1) deprives owners of their property without due process of law; and

(2) allows the State to engage in a "taking" of private property for a private use.

II. The trial court erred in

(1) admitting into evidence certain invoices produced for the first time at trial;

(2) determining that December 19, 1986, was the date of last delivery;

(3) considering certain "unsigned" invoices; and

(4) awarding pre-judgment interest.

We find no merit in AMI's first complaint or in parts (2), (3), and (4) of its second complaint. We do find partial merit in argument II(1), however, and shall therefore remand the case for an appropriate amendment to the judgment.

## *Background*

In the spring of 1986, AMI hired Prime Construction Company, a sister company of AMI, to do certain renovation work at the hotel. Prime subcontracted a portion of that work to MJY General Contractors, which, in turn, through an oral agreement, purchased building materials from Fairmount.

From July through December of 1986, Fairmount allegedly supplied MJY with goods having a value of $75,147.40. In September and October, MJY paid Fairmount a total of $9,000. In December, Fairmount received a third payment of $24,750 in the form of a check drawn by Prime and made payable to both Fairmount and MJY. Later that month, MJY walked off the job and apparently "disappeared," leaving $41,397.40 of its debt to Fairmount unpaid.

On March 18, 1987, Fairmount gave AMI written notice of its intention to claim a mechanics' lien. When that threat proved unavailing, it proceeded to file a petition for the lien. On August 21, 1987, the court entered an interlocutory

order establishing a lien in the amount claimed—$41,397.40. AMI responded with a motion to dismiss the petition on the ground that the mechanics' lien law is unconstitutional. After a full evidentiary hearing, the court denied AMI's motion and entered a final order establishing a lien in the amount of $50,664.75—$41,397.40 in principal debt found to be due and $9,267.35 in pre-judgment interest.

## I. *Constitutionality*

AMI mounts a dual attack on the validity of the law, complaining, first, that it deprives an owner of his property without due process of law and, second, that it results in an unconstitutional "taking" of property. We reject both challenges.

### (1) Due Process

In *Barry Properties v. Fick Bros.*, 277 Md. 15, 353 A.2d 222 (1976), the Court of Appeals evaluated Maryland's former mechanics' lien law in light of the due process considerations of the 14th Amendment and Article 24 of the Maryland Declaration of Rights. The Court determined that because, under that law, a lien attached as soon as work was performed or material supplied, the law "permit[ted] an owner to be deprived of a significant property interest without notice or a prior hearing, and thus [was] unconstitutional...." *Id.* at 31, 353 A.2d 222 (footnote omitted). Therefore, the Court "excis[ed] that portion of the statute which purport[ed] to create a lien from the time work [was] performed or materials furnished to the time a lien is established by judicial determination in a proceeding sufficient with respect to due process" and explained that "there can be no existing lien on property until and unless the claimant prevails either in a suit to enforce the claimed lien or some other appropriate proceeding providing notice and a hearing." *Id.* at 37, 353 A.2d 222.

As a result of *Barry Properties*, the Legislature, which was in session when the case was decided, promptly rewrote the law in a manner "designed to avoid the procedural due process denial found in the former statute." *Tyson v.*

*Masten Lumber & Supply*, 44 Md.App. 293, 295, 408 A.2d 1051 (1979), *cert. denied* 287 Md. 758 (1980). Despite AMI's assertions to the contrary, we believe that the Legislature has succeeded in that endeavor.

As we explained in *Tyson*, under the current law, a lien does not attach automatically upon the performance of work or the supply of materials. The supplying of work or materials merely entitles the supplier to seek a lien for the value of that work or materials, if the other conditions set forth in the law are met. One of those conditions, relevant here, is that, if the supplier is a subcontractor having no direct contract with the owner, he must give written notice to the owner, within 90 days after last supplying his work or materials, of his intention to claim a lien.

Even when the claimant satisfies the various eligibility requirements, however, a lien is not automatically created. The lien can be created only by a court, and then only after the owner has had an opportunity to contest both the claim itself and the claimant's entitlement to a lien. The claimant's petition must be supported both by affidavit and by all documents constituting the basis of the lien (Md.Real Prop. Code Ann. § 9–105); the petition must be initially reviewed by the court and found at least facially sufficient (§ 9–106(a)); and the court must then afford the owner an opportunity to answer the petition and present evidence in his behalf. Only in conformance with those requirements and procedures may a lien be established.

To AMI, this is not enough. It urges that, because an owner is not in privity with subcontractors and may not even be aware of their existence until after they have supplied work or materials, the owner may still end up having to pay twice for the same work. Ignorant of the subcontractor, he may innocently pay his general contractor and then, if the general contractor fails to pay the subcontractor, have to pay the subcontractor himself. As subcontractors have up to 90 days from the date they last supplied work or materials to give notice to the owner, a dishonest general contractor can abscond with the owner's money

before the owner is even made aware that subcontractors are on the job, or who they are.

On this premise, AMI urges that, although the law requires some notice on the part of subcontractors, the notice is not "meaningful." Notice would not be meaningful, it claims, unless subcontractors were required to inform the owner of their involvement *before* performing any work. Only then, it contends, can an owner take steps to ensure that the subcontractors are paid.

Although it appears that at least one State (New Jersey) and perhaps a few others have imposed that requirement by statute, we are aware of no judicial pronouncement imposing the requirement as a matter of due process. In this context, due process requires only that a defendant be notified of any claim against him that would deprive him of his property and that he be afforded some type of hearing before the deprivation occurs. *See Barry Properties v. Fick Bros., supra,* 277 Md. at 25–32, 353 A.2d 222 (discussing *North Georgia Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969)). It does not mandate notice to a *potential* defendant that a claim *might* arise so that he can take steps to avoid it.

The kind of advance notice sought by AMI may indeed be very helpful to owners, but it could also be a substantial burden to suppliers. For one thing, it is not always clear who the "owner" is; in the case at bar, for example, one entity owned the fee, another owned the leasehold for part of the time, and a third owned the leasehold for another part of the time. To require every supplier of labor or material to search the land records (and even then endeavor to determine whether there are any unrecorded leases or assignment of leases in existence) or, alternatively, to find a suitable place to affix some notice at the jobsite before supplying a day's work or a dollar's worth of material can

be a very troublesome impediment to efficient construction. We observe, moreover, that an owner is *not*, as AMI believes, unable to protect himself. There are a number of ways in which an owner may avoid the establishment of a lien on his property, among them, (1) requiring the general contractor to furnish a bond, (2) retaining a percentage of each payment to the general contractor until the project is complete as a reserve fund for paying potential claims, (3) negotiating an agreement with the general contractor whereby the owner will pay the subcontractors directly, or (4) negotiating an agreement with the general contractor whereby all payments to the subcontractors are by checks issued by the owner and made payable to both the general contractor and the subcontractor. *See generally* MICPEL, *Mechanics' Liens and the Maryland Trust Fund Law* at 65–74 (revised ed. 1988).

It may have been in tacit recognition of some of these safeguarding mechanisms that the Court of Appeals has observed that:

> "If [the owners'] failure to protect themselves against an impecunious contractor causes them to have to pay twice for materials, it is their own fault. The mechanic's lien law was passed to cover just such a situation and to protect material men. The theory of it is that the owner gets the benefit of the material, and he has control of the money. If he negligently and carelessly pays the money out to the contractor without taking precautions to see that it is applied to the payment of the materials which go in the building, then he must stand the loss rather than the material man, who has no opportunity to protect himself once he has delivered the materials."

*Bounds v. Nuttle*, 181 Md. 400, 406, 30 A.2d 263 (1961). *See also Riley v. Abrams*, 287 Md. 348, 357, 412 A.2d 996 (1980); *Dickerson Lumber Co., Inc. v. Herson*, 230 Md. 487, 491, 187 A.2d 689 (1963); *Reisterstown Lumber Co. v. Reeder*, 224 Md. 499, 507, 168 A.2d 385 (1961); *T. Dan Kolker, Inc. v. Shure*, 209 Md. 290, 296, 121 A.2d 223 (1956).

In summary, then, we do not believe that the current law deprives an owner of property without due process of law. The one deficiency found by the Court in *Barry Properties* has been corrected.

### (2) Unconstitutional Taking

■ Relying principally on *Arnsperger v. Crawford*, 101 Md. 247, 61 A. 413 (1905) and *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), neither of which is on point, AMI attacks the mechanics' lien law as a State scheme to take private property for a non-public use, i.e., for the use of laborers and materialmen who have no contractual privity with the owner.

We do not share that view of the law. A mechanics' lien is not substantially different in purpose or effect than any other kind of property lien established by law. It represents, in one sense, a legislatively determined balance between the competing economic interests of owners of property, on the one hand, and those who, by the investment of their labor or capital, improve or increase the value of that property and expect to be paid therefor.[1] But there is also a public benefit that flows from this balance. As the Court pointed out in *Barry Properties, supra*, 277 Md. at 18, 353 A.2d 222, "[g]enerally speaking, mechanics' lien statutes, in an endeavor to provide for the public welfare, are designed to encourage construction by ensuring that those who contribute to a project are compensated for their efforts."

Indeed, these kinds of statutory liens are, themselves, not substantially different than the traditional judicial lien placed (or placeable) on a debtor's property following the entry of a judgment. They all rest on the fundamental principle undergirding both our economic and legal system that the ultimate measure of wealth and therefore the ultimate source of debt satisfaction is property. So long as

---

1. See Md.Com.Law Code Ann. §§ 16–101—16–701, entitling workmen and materialmen to liens on aircraft, boats, motor vehicles, and livestock, and providing special liens in favor of hotel keepers and hospitals.

the process for adjudicating liability and establishing the amount of debt owed is fundamentally fair and comports with the requirements of law, there is nothing unfair, and certainly nothing unconstitutional, about the subjection of the debtor's property, upon compulsion of law, to the satisfaction of that debt. The State isn't "taking" the debtor's property for either public or private use; it is merely creating an orderly process for the satisfaction of a debt that has a basis in law and that has been found by a court to be due and owing.

## II. *Invoices*

Section 9–105 of the Real Property article requires that, "[i]n order to establish a lien under this subtitle," a claimant must file three documents with the clerk of the circuit court:

(1) a petition containing the information set forth in § 9–105(a)(1), including "[t]he nature or kind of work done or the kind and amount of materials furnished, the name of the person for whom the work was done or to whom the materials were furnished and the amount or sum claimed to be due, less any credit recognized by the petitioner";

(2) an affidavit by the petitioner or his agent "setting forth facts upon which the petitioner claims he is entitled to the lien in the amount specified"; and

(3) "Either original or sworn, certified or photostatic copies of all material papers or parts thereof, if any, which constitute the basis of the lien claim, unless the absence thereof is explained in the affidavit."

*See also* Md.Rule BG71(b) mirroring these requirements.

If the court, upon its preliminary review, determines that a lien should attach, copies of these "pleadings and documents on file" are served on the owner together with the court's show cause order. *See* § 9–106(a).

In its petition, Fairmount averred that it had furnished "various types and quantities of lumber and building materials" to both MJY and Prime and that "[a]s a result of furnishing said work and materials, there remains due and

payable" $41,397.40. The "exact types and quantities" of lumber and materials supplied, it said, "are set forth on Plaintiff's invoices, copies of which are attached hereto and made a part hereof as Exhibit 'A.' " The affidavit accompanying the petition, made by Fairmount's Vice President, Adam Woltman, stated merely that:

"All of the matters and facts set forth in the Petition to Establish and Enforce a Mechanic's Lien, which are adopted herein, are true and correct; and, the Exhibits attached to said Petition, which are also made a part of this Affidavit, are true copies of all material papers which constitute the basis of the Lien claimed."

The exhibits attached to the petition consisted, in relevant part, of (1) a copy of a running account billing to MJY referring, by date and invoice number, to 55 charges and four credits, and showing a net amount due of $41,397.40, (2) copies of 46 delivery tickets, (3) copies of 46 invoices, each based on the counterpart delivery ticket, and (4) one credit ticket for certain material that was returned.

The problem here arises from the fact that the $41,397.40 claimed was based on all 55 invoices referred to in the billing but that nine of those invoices (and counterpart delivery tickets) were not included among the exhibits.[2] The invoices (and supporting delivery tickets) that were referred to in the billing but not included among the exhibits are Nos. 7441, 7442, 7231, 7250, 7258, 7270, 7324, 7563, and 8097. At trial, Fairmount offered, and over AMI's objection the court received, into evidence all 55 invoices, including those nine. The lien established by the court was based on all 55.

---

**2.** Fairmount continues to maintain that all 55 invoices and delivery tickets were included as exhibits. The record very clearly shows, however, that only 46 were attached to the petition actually filed with the clerk. AMI contends that the other nine sets of invoices and delivery tickets were not included among the documents served on them, and there is no reason to suppose that AMI received anything more than was filed with the clerk.

AMI makes three basic complaints about what happened. First, it urges that because the invoices are "material papers ... which constitute the basis of the lien claim" and because their absence was not "explained in the affidavit," Fairmount failed to comply with the requirement of § 9–105(a) and is therefore not entitled to any lien at all.

The second complaint also challenges the entire lien. The notice of Fairmount's intention to claim a lien was given to AMI on March 18, 1987. Because the law requires such notice to be given "within 90 days after doing the work or furnishing the materials," § 9–104(a), it became critical for Fairmount to show a delivery on or after December 18, 1986. The billing shows no charges *on* December 18 and but three charges after that date—No. 7441, representing a charge of $498.16 on December 19, No. 7563, representing a charge of $158.45 on December 30, and No. 8097, representing a charge of $805.14 on February 3, 1987. All other charges are shown on the billing to have been made on or before December 17, although, in answers to interrogatories and in testimony at trial, Fairmount contended that the materials represented by Invoice No. 7442, which the billing shows as December 17, were actually delivered on either the 18th or the 19th. Whenever those materials were delivered, the fact is that none of those invoices were attached to the petition; they are among the nine omitted. For that reason, AMI contends that Fairmount failed to prove a delivery within 90 days of its notice.

Finally, in this regard, AMI urges that, even if the omission of the invoices is insufficient to preclude the establishment of a lien, they should at least be deducted in calculating the amount of the lien.

We shall consider these points in order.

### (1) Omission Of Material Papers

Preferring rhetoric to fact, Fairmount dismisses AMI's complaint about the omission of the nine invoices as "baseless and disingenuous." In derogation of the record, it asserts that the nine exhibits *were* attached to the petition;

in derogation of the clear requirement of § 9–105 that all material papers constituting the basis of the lien claim be attached to the petition, it contends that AMI was not prejudiced because copies of the invoices and delivery tickets were eventually sent to the general contractor, Prime, which was a "sister company" of AMI and "also shared offices with AMI"; and, in further derogation of the record, it claims that copies of the missing invoices were later supplied to AMI during discovery. In this context, it is the argument of Fairmount that borders on the "baseless and disingenuous."

■ The nine exhibits were not attached to the petition. Nor were they supplied to AMI during discovery.[3] And it hardly need be said that sending copies to the prime contractor, even if it was a "sister company" and "shared offices" with AMI is not the equivalent of attaching copies to the petition. The question, then, is whether the invoices or delivery tickets are indeed "material papers" within the meaning of § 9–105(a)(3), and, if so, what the consequence is of their omission.

■ The word "material," even when restricted to its adjectival form, has a very broad meaning which, in part, must be shaped by the noun it modifies and the context of its use. Language attempting to define either the word or its contours has to be read in terms of what the court was considering at the time—a material *fact*, a material *misrepresentation*, a material *change*, a material *injury*, a material *breach*, a material *omission*, material *evidence*, for ex-

---

**3.** In Interrogatories Nos. 13 and 19, AMI asked Fairmount for information about each item sold to the general contractor and to MJY. With respect to the former, the answer was "See invoices attached to Petition"; as to the latter, the answer to the request for the "date and place delivered to MJY" was "See invoices." AMI thereafter filed a request for the production of "[a]ll documents which set forth, describe, refer or relate to your answer to" Interrogatories Nos. 13 and 19. The answer was that all such documents "are attached as Exhibits to the Petition to Establish and Enforce a Mechanic's Lien or are attached to Plaintiff's Answers to Interrogatories." As we have indicated, that just isn't so.

ample. At the very least, and as a general or common concept, however, "material" denotes something "[i]mportant; more or less necessary; having influence or effect; going to the merits...." *Black's Law Dictionary* 504 (abridged 5th ed. 1983).

Section 9–105(a)(3), requiring the attachment of "all material papers ... which constitute the basis of the lien claim," is obviously a "notice" provision. The notice of intention to claim a lien required by § 9–104 need contain only a general statement as to the nature of the claim; the work done or materials furnished need be only "briefly described," and indeed in this case they were only briefly described. Section 9–105(a)(3) requires more. Because the claimant is entitled to a quick hearing on his petition, which is likely to take place before any meaningful opportunity for discovery (*see* § 9–106(a) providing for a 15–day show cause order), § 9–105(a)(3) is the critical provision that affords the owner an opportunity to examine the principal evidence upon which the claimant intends to rely in order to ascertain and prepare any available defense. It is not a provision that can be dispensed with lightly.

Just what papers are material has to be considered in that light. Where there is no written contract or other document specifying the work done or materials furnished, invoices or delivery tickets may be the only papers indicative of the transactions that underlie the claim. *See* MIC-PEL, *Mechanics' Liens and the Maryland Trust Fund Law* at 50 (revised ed. 1988). An account summary that merely refers by date and number to other documents is not a substantial equivalent; it does not describe the work done or materials furnished and does not really establish when the work was done or materials were furnished but only when the debit or charge was created. We believe that, in this circumstance, the invoices and delivery tickets, being the primary documents directly indicating the nature and quantity of the goods sold, the date of sale, and the unit or

total price charged for the goods, were material and should have been attached to the petition.[4]

■ What we have here, however, is not a complete failure to comply with § 9–105(a)(3) but only a partial one. Only nine of the 55 relevant invoices, comprising about $13,000 of the $75,000 worth of materials allegedly furnished, were missing. The defect does not suffice to negate the entire lien. In *Development Corp. v. Ross*, 142 Md. 522, 121 A. 732 (1923), an argument was made that some of the charges underlying a lien claim were not sufficiently described. The Court found that the description *was* adequate, but it nevertheless noted, at 524:

"But if we were prepared to hold that the accounts are imperfect as regards the particular items to which objection is made, we would not be justified, for that reason, in quashing the writ of *scire facias*, and in thus defeating the whole lien claim which is sought to be enforced. There are many items in the accounts to which no criticism has been directed and which are clearly sufficient according to the strictest view of the statutory provision on the subject. To the extent of those charges the lien claim was unquestionably valid."

Although that statement was, of course, *dicta* and pertained to an earlier version of the law, we think that it is a fair and accurate statement of the current law, and we therefore follow it. Accordingly, we reject the notion that the omission of the nine invoices destroys the entire claim.

### (2) The 90–Day Requirement

As we observed, for Fairmount to be entitled to a lien, it must allege and show that it supplied materials to the project on or after December 18, 1986. In its petition, it alleged that it furnished materials during a period com-

---

4. Fairmount itself recognized that the invoices and delivery tickets were material, for it attached 46 of them (and claimed that it attached all 55). It is hardly in a position, therefore, to argue that those documents are not "material papers ... which constitute the basis of the lien claim."

mencing July 25, 1986, "and ending on or about December 19, 1986." The billing included with the petition mentioned three invoices on or after December 18—Nos. 7441, 7563, and 8097—and Fairmount later asserted that a fourth delivery, evidenced by No. 7442, also occurred on or after December 18.[5] But none of those four invoices, or the delivery tickets on which they were based, were included with the petition or supplied in response to AMI's interrogatories or request for the production of documents.

Upon that failure, AMI urges that the court erred in allowing Fairmount to rely upon those invoices and thus in concluding that Fairmount had established a supply of materials by it on or after December 18.

■ For the reasons expressed in Part (1) above, which we shall advert to further in Part (3) below, we believe ' the court did err in admitting and relying upon Invoice Nos. 7563 and 8097. We have a different view with respect to Invoice Nos. 7441 and 7442, however.

■ As we indicated in Part (1), § 9–105(a)(3) is essentially a "notice" provision. The billing did inform AMI that Fairmount was relying upon Invoice Nos. 7441 and 7442, and, although that alone would not suffice, more detailed information was supplied to AMI with respect to those two invoices prior to trial. In answer to Interrogatories Nos. 6 and 7, Fairmount specifically informed AMI that the last delivery was ceiling tile, represented by Invoice No. 7442, on December 19, 1986,[6] and there is a further assertion by

---

**5.** It was later revealed that the items encompassed by Invoice Nos. 7563 and 8097 were never actually delivered to MJY or to the jobsite. Fairmount included them in its claim on the ground that they were specially ordered goods.

**6.** The Interrogatories and answers were as follows:
"INTERROGATORY NO. 6: State the exact date the last item of work or materials was furnished to MJY, and describe such work or materials (or both if applicable) in detail.
ANSWER: Last materials were furnished to MJY and Prime on December 19, 1986. Materials: ceiling tile.

Fairmount, not denied by AMI, that Invoice Nos. 7441 and 7442 were presented and discussed at the deposition of Fairmount's Vice President, Adam Woltman.[7] The purpose of the statutory requirement—a fair opportunity to examine the basis of the claim and to prepare a defense to it—was therefore achieved. Accordingly, we find no error in the court's allowing Fairmount to rely at trial upon those invoices and the deliveries evidenced by them.

As Mr. Woltman did clearly state at trial that the materials included in Invoice No. 7442 were delivered to MJY's agent on or after December 18, there was sufficient evidence to support the court's finding that the last delivery occurred within 90 days of the notice.

### (3) Consideration Of Challenged Invoices In Calculating Amount Of Lien

#### (a) *Omitted Invoices*

As we indicated in Part (1) above, Fairmount's failure to comply with § 9-105(a)(3) does not deprive it entirely of its right to claim a lien. That failure does, however, place in question its right to a lien for the

---

INTERROGATORY NO. 7: State the invoice number(s) on which the work or material (or both if applicable) referred to in Interrogatory No. 6 appears.
ANSWER: Invoice # 7442, dated as December 17, 1986, Ticket No. 19420 (PO# 8805)."

7. Fairmount attached as an appendix to its brief what purports to be an excerpt from Mr. Woltman's deposition showing some discussion about Invoices 7441 and 7442. It stated that the document was attached "in compliance with Md.Rule 8-504(a)(7) to supplement Appellants' Appendix, and to rebut arguments raised in Appellants' Brief." We observe, first, that Rule 8-504(a)(7) deals with statutory material, not exhibits or evidence. More importantly, the deposition appears nowhere in the record, and, for that reason, its inclusion in an appendix is wholly improper. *Community Realty Co. v. Siskos*, 31 Md.App. 99, 354 A.2d 181 (1976); *Kemp-Pontiac-Cadillac v. S & M Constr.*, 33 Md.App. 516, 365 A.2d 1021 (1976). The point sought to be made by Fairmount is established by other, more appropriate, means, however. In the course of Mr. Woltman's testimony at trial, AMI's counsel conceded that the invoices had been discussed during Woltman's deposition.

amounts represented by the omitted invoices. In Part (2), we concluded that AMI had fair notice of Invoice Nos. 7441 and 7442, notwithstanding Fairmount's failure to attach copies of them to the petition, and so we find no reason to deny Fairmount a lien as to the value of the materials represented by those invoices.

That is not the case with respect to Nos. 7231, 7250, 7258, 7270, 7324, 7563, and 8097, however. Nothing in the record before us indicates that AMI had any information about those invoices prior to trial beyond the brief reference to them in the billing. When AMI objected to the admission of those invoices at trial, precisely on the ground that they had not been produced earlier, the court seemed to take some cognizance of the objection but accepted the entire batch of the 55 invoices with the caveat that, "we'll let this whole package in and then compare it with whatever's in this file and to—we'll rule on your point at that time." Insofar as the record reveals, the promised comparison was never made by the court; the lien declared by the court encompassed all 55 invoices. This was error and needs to be corrected; on the record before us, we believe that the seven invoices noted should not have been admitted into evidence or considered by the court in calculating the amount of the lien. *Development Corp. v. Ross, supra,* 142 Md. 522, 121 A.2d 372. We shall therefore remand the case for an appropriate modification of the judgment.

### (b) *"Unsigned" Invoices*

Apart from the complaint discussed in subpart (a) above, AMI challenges nine invoices—Nos. 7563, 6074, 6151, 6186, 6354, 6738, 7231, 7442, and 8097—on the ground that the delivery tickets supporting them are "unsigned" by any agent of MJY and therefore do not evidence delivery of the materials. Because this objection was not made below as to any invoices except No. 7563 and possibly No. 8097, and because we have already found that Nos. 7563 and 8097 should not have been admitted because AMI did not receive

fair notice of them prior to trial, we shall not address this issue on appeal.

### (4) Pre-judgment Interest

The lien declared by the court included not only the $41,397.40 in principal debt claimed by Fairmount but also $9,267.35 in pre-judgment interest. The interest was based on the condition stated on each of Fairmount's invoices and delivery tickets that "[a] finance charge of 1½% per month will be added to all past due accounts."

Relying on *Burdette v. Burrows*, 228 Md. 568, 180 A.2d 833 (1962), AMI claims that (1) it was inappropriate to include any interest for the period prior to establishment of the interlocutory lien by the court—August 21, 1987—and (2) the interest thereafter should be at the statutory rate of 10% per annum, rather than the 18% rate imposed by Fairmount. We do not agree.

It is important to note, initially, that *Burdette* and the several earlier cases upon which the Court there relied were decided under the former mechanics' lien law.

The principle espoused in *Burdette* goes back at least as far as *German Luth. Church v. Heise*, 44 Md. 453 (1876). In that case, interest was neither charged nor claimed on the account itself, and the question was whether, in that circumstance, the claimant was entitled to any interest. Under the lien law in existence at the time, the lien became a "claim of record" when the lien claim was filed with the court. Thus, the Court held that the claimant was entitled to interest at the statutory rate applicable to judgments from that point. *Id.* at 472. *See also T. Dan Kolker, Inc. v. Shure*, 209 Md. 290, 303, 121 A.2d 223 (1956).

The converse of that situation arose in *Hensel v. Johnson*, 94 Md. 729, 51 A. 575 (1902) and *Eastover Stores, Inc. v. Minnix*, 219 Md. 658, 150 A.2d 884 (1959). It is not clear from the Opinion in *Hensel* whether any interest was claimed on the account itself. The trial court allowed interest at the statutory rate from the date of the last

delivery which, relying on *German Luth. Church v. Heise,* the Court held was improper. In *Eastover Stores, Inc.,* the mechanics' lien claim itself did not include an amount for interest; it specified a principal amount due of $184,096. In the bill of complaint to foreclose the lien, filed contemporaneously with the claim, the plaintiff asserted that there was due $184,096 "together with interest," although neither the amount, rate, nor basis of entitlement to interest was specified. *See* Brief and Record Extract in No. 180, Sept. Term, 1958. As in *Hensel,* the trial court allowed interest at the statutory rate from a time antedating the filing of the lien. *Id.,* Record Extract, E. 24. Citing *Hensel* and *T. Dan Kolker,* the Court of Appeals struck that part of the decree.

We perceive two differences between the case at bar and those noted above: first, we are dealing here not with a premature commencement of statutory interest on judgments but rather with contractual interest specified in Fairmount's delivery tickets and invoices; and, second, in light of the changes in the mechanics' lien law since those cases were decided, it may well be that the allowance of even pre-judgment interest at the statutory rate should be governed more by the principles enunciated in *I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 344 A.2d 65 (1975), than those followed in the *Burdette* series. We need not decide the second of these questions, however, as the first will suffice to sustain the court's action in this case.

It is commonplace now for commercial sellers of goods and services to charge interest on balances remaining unpaid after a given period. This is simply a reflection of the fact that an unpaid account constitutes a cost to the seller, an increasingly high cost. By not paying the account when due, the buyer is, in effect, using the seller's money, and it is not at all unreasonable for the seller to demand a recoupment of the value of that use. Nor is it unreasonable for a court to regard that value as having been added to the goods or services themselves, for to do otherwise would be to ignore the real economic consequence of past due accounts. If, as stated in *Barry Properties v. Fick Bros.,*

*supra,* 277 Md. at 18, 353 A.2d 222, the purpose of the mechanics' lien law is to ensure "that those who contribute to the project are compensated for their efforts," it follows that that purpose would include an incentive to see that they are paid expeditiously.

Accordingly, we find no error in the allowance of prejudgment contractual interest, although the amount of that interest will have to be adjusted to conform to the modification required in the principal amount of the lien.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR MODIFICATION OF JUDGMENT IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID ONE–HALF BY APPELLANTS, ONE–HALF BY APPELLEE.