589 A.2d 536

**The GREENS AT HILTON RUN I LIMITED PARTNERSHIP**

v.

**ROLLIN BUILDING SUPPLY COMPANY, INC.**

**No. 948, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 7, 1991.

Starke M. Evans, Federalsburg (Anne C. Ogletree and Hairston, Gorman, Ogletree and Greenleaf, on the brief), Denton, for appellant.

Robert K. Goren (Goren & Hofberg, on the brief), Rockville, for appellee.

Argued before MOYLAN, BLOOM and CATHELL, JJ.

MOYLAN, Judge.

The Greens at Hilton Run I Limited Partnership (The Greens) has appealed from a mechanic's lien established in favor of Rollin' Building Supply Company, Inc. (Rollin') in the amount of $17,776 by the Circuit Court for St. Mary's County. The Greens raises the following issues:

1. Whether the lien releases executed by Rollin' and the subcontractor released the builder or owner from the mechanic's lien;

2. Whether Rollin' could apply all payments by the contractor on a first in-first out basis to the subcontractor's only account with Rollin' for the three projects all parties were involved in; and

3. Whether Rollin' was estopped from raising non-payment and claiming a lien when it had full control of funds sufficient to satisfy the subcontractor's account.

Rollin' cross appeals, contending that the court erred in finding that Rollin' was not entitled to recover the full amount of its lien.

## The Facts

The Greens at Hilton Run in St. Mary's County is one of several separate limited partnerships established to build multifamily housing projects.[1] Case Edwards Development, Inc. is a general partner in each of the limited partnerships. The contractor for the projects, Case Edwards Construction Company, Inc. (Case Edwards), subcontracted with Duane Lundberg T/A Bay Central Installation (Lundberg) to furnish and install the vinyl siding. Lundberg, in turn, solicited Rollin' to provide the siding and related materials at $60 per square[2] for the projects. Lundberg had only one account with Rollin' and all purchases, regardless of the project, were charged to that account. Rollin' credited all payments, made jointly to Lundberg and Rollin' by Case Edwards, to the oldest outstanding invoices first.

At issue are the 773 squares of siding and materials delivered by Rollin' to the Hilton Run project, also known as the Lexington Park project, between April 2 and June 15, 1988.[3] On March 31, 1988, Lundberg's account of payments due by it to Rollin' stood at $66,368.26 for deliveries to the other two projects. When Lundberg's account totalled $95,-137.78 at the end of April, Rollin' requested a meeting with Case Edwards to discuss Lundberg's arrearage. No payments toward the Lexington Park project had been made prior to the meeting.

The May 2 meeting attended by Lundberg, Case Edwards and Rollin'[4] revealed that Lundberg had misled the other

---

1. The Greens at Kent Commons in Dover, Delaware and The Greens at Shoemaker Pond in Wicomico County, Maryland are the other projects.

2. A "square" consists of 100 square feet, a standard unit of measure for siding.

3. Lundberg was discharged on or about June 15, 1988. An additional 523 squares and accessories were subsequently furnished by Rollin' and paid for by Case Edwards. These transactions are not part of this suit.

4. The Greens did not attend the meeting.

parties as to his labor costs. He had been receiving checks from Case Edwards for labor (which he allegedly overstated), as well as the joint checks for materials (which he allegedly understated). Rollin' was not aware Lundberg had received compensation for his labor costs in a separate check. In order to insure that Rollin' would receive the full balance due it, and to ensure that Lundberg would continue to provide labor to finish the projects as Case Edwards wished, Rollin' proposed 1) that the joint checks for labor and materials issued by Case Edwards be given directly to Rollin' rather than Lundberg, and 2) that Rollin' would credit itself $60 per square of siding installed, plus $5 per square on the arrearage, and pay Lundberg his labor costs.

Although the parties agreed to implement the Rollin' proposal, each had a different interpretation as to its application. According to Rollin', it was to pay the third-party labor costs first as presented by Lundberg, and then to credit the rest to Lundberg's account. According to The Greens, Rollin' was to pay itself first, collect the additional $5/square, and then pay the third-party labor costs.

Six of the joint checks distributed to Rollin' related to the Lexington Park project before Lundberg was terminated:

| Date | Check No. | Amount |
|------|-----------|--------|
| 5/03/88 | 21198 | 8,164.80 |
| 5/12/88 | 21270 | 16,329.60* |
| 5/19/88 | 21423 | 10,108.80 |
| 5/27/88 | 21597 | 9,552.60 |
| 6/10/88 | 21849 | 6,403.60 |
| 6/15/88 | 22115 | 14,094.00 |
| | | 64,653.40 |

* These amounts were broken out of a $24,786 check. The rest of the funds involved the Wicomico County project.

Another check, number 22722 dated 7/19/88, in the amount of $7,840.80 was issued to Rollin' on July 19, 1988, bringing the total disbursed to Rollin' to $72,494.20.

According to Mark Winkler, an officer of Rollin', the joint checks were distributed by Richard Norton (Norton), then president of the corporation. Norton "would try to ascer-

tain how many squares [Lundberg] had done the week before, and how many squares the draws were based on, and pay him." Winkler further testified:

"Lundberg would come in requesting a certain amount of money. Rick would determine, or try to make a determination how many squares this particular check was based on his applying. And try to base what he gave [Lundberg] on the reasonableness of that figure. And try to get for us no less than sixty dollars a square."

Norton's uncontroverted testimony corroborated Winkler's summary. Norton also testified that Rollin' paid Lundberg's labor before it paid itself from the first two checks. Handwritten notations on the check stubs of the next four checks indicate that the Rollin' paid itself for a certain amount of squares and then gave the balance to Lundberg. The stub of the last check was not in evidence.

Five undated, unwitnessed form lien releases were signed by Norton and Lundberg. Norton's name appeared on the line for "stairwork." No signature appeared on the owner's signature line. All the releases had handwritten notes in the margins indicating "Bay Central," and two mentioned "Rollin' Supply." Three had check numbers written on them, and two releases indicated (according to Norton's testimony) what had been released:

| Release [5] | Date | Check No. | Released |
|---|---|---|---|
| 1 | 5/19/88 | 21473 | ----- |
| 2 | 6/10/88 | ----- | ----- |
| 3 | 6/10/88 | 21849 | Bldg # 7 33 sq |
| | | | Bldg # 10 30 sq |
| 4 | 5/27/88 | 21597 | ----- |
| 5 | 5/27/88 | ----- | Bldg # 2 16 sq |
| | | | Clubhs 25 sq |

Norton testified that the purpose of his signature was merely to signify that Rollin' had received a check. He also

---

5. The release numbers used in this opinion are for reference only.

testified that six buildings and a clubhouse had been completed by the time Lundberg was terminated.[6]

On December 12, 1988, Rollin' petitioned to establish and enforce a mechanic's lien in the amount of $39,516.74 against The Greens. The Greens did not contend that Rollin' failed to comply fully with the statutory requirements under Md.Real Prop.Code Ann. § 9–104 *et seq.* (1974, 1988 Repl. Vol.), and the trial court proceeded as if the lien was perfected.

The parties stipulated that Rollin' received $72,494.20 in joint checks subsequent to the May 2 arrangement. The trial judge determined Rollin' paid Lundberg $36,694.80 from the joint checks for labor, although the amount is actually $1,000 higher.[7] Of the amount allocated to labor, $28,604 was directly related to the Lexington Park project. The parties agreed that the fair market value of the 773 squares and accessories was $60 to $62 per square; the judge assigned a value of $60 per square, thereby placing a value of $46,380 on the 773 squares. The court then held that the lien releases were too vague to determine the true nature and extent of any release. Rollin', therefore, "was entitled to take out all amounts then due it on account of the Lexington Park job, and the other two jobsites as well," but it could not achieve a lien status greater than that represented by materials incorporated into the Lexington Park jobsite, e.g., $46,380. After determining that Rollin' had not looked after its financial interests when it paid Lundberg's labor costs, the lower court credited The Greens

---

6. Lonnie Spraberry, a Case Edwards employee, stated that 7 buildings had been completed. This seems more in line with the amount of materials delivered. Each building required 104 squares of siding, while the club house required 25 squares.

7. Winkler testified that the amount was $37,694.80. As revealed in the transcript, the trial judge did not hear the correct amount paid to Lundberg:
   "[Winkler]: $37,694.80 the total of the net payments.
   The Court: In other words, you kept $36,694.20. No, you gave that to Lundberg."

$28,604 and established a lien in the amount of $17,776 in favor of Rollin'.

Both parties appealed the judgment.

### Standard of Review

Although we review the case on both the law and the evidence, we "will not set aside the judgment of the trial court on the evidence unless clearly erroneous." Md.Rule 8–131; *Landover Ass. Ltd. Partnership v. Fabricated Steel Prod. Inc.* 35 Md.App. 673, 682, 371 A.2d 1140 (1977).

### Lien Releases

The Greens urges this Court to find that the trial court erred in determining that the five lien releases executed by Rollin' with Lundberg were ineffective. According to The Greens, Rollin' knew which buildings were released and should be estopped from claiming a lien. Rollin', on the other hand, contends that the judge was correct in not taking the releases into account. We hold that the trial judge was not clearly erroneous in determining that the lien releases are "probative only of the fact that some portion of the potential lien has been released." The lower court could not reconstruct what had happened; nor can this Court.

The Greens argues that, upon an examination of the totality of the circumstances, "the only possible inference is that Norton executed each release to show receipt of a check for the payment of a certain amount of material." Lonnie Spraberry, a Case Edwards employee, testified that Lundberg would send an invoice to Case Edwards when a building was completed, specifying the building number. Case Edwards would then prepare the check and lien release which were sent out simultaneously. Each check stub indicated the project number, the Lundberg invoice number, a date and the amount paid. The person picking up the check was given the lien release. According to Spraberry, a letter was then sent out by the accounting department stating that "you won't get another check until you sign the

lien release and we have it in our possession." The Greens notes that Norton released a specific number of squares on two of the forms, and that the testimony showed Norton attempted to determine "how many squares this particular check was based on." From these facts The Greens concludes that Norton, "personally knew what amount of material was involved," and that Rollin' is thus estopped from claiming a lien.

The trial judge was not clearly erroneous in determining that three of the releases were:

> "probative only of the fact that some portions of the potential lien had been released, [as] one cannot determine from the document what is the true nature and extent of the release."

It is not readily apparent how a general lien release for a specific project can be effective when the materials paid for, as indicated by the May 12, 1988 check stub, encompassed more than one project. Although the forms provided plenty of space for descriptive detail as to just what was released, The Greens merely inserted the project name; it was Norton who limited two of the releases to a certain amount of material for specific buildings.[8] Seven checks were issued, moreover, but only five releases were signed. Even if we were to find The Greens' argument persuasive, some portion of the lien was clearly not released.

------

8. The form of the release is as follows:
   "WHEREAS, WE THE SUBSCRIBERS, have furnished the materials and work for erection of The Greens at Hilton Run Apartments on 2 parcels of ground situate in the Town of Lexington, MD, and known as
   The Greens at Hilton Run Apartments

   and have agreed to release all liens which we, or any of us, have, or might have on said buildings for work or materials contracted for or furnished in, for, or about the erection, construction, improvements or repairing of the said building, including fencing, paving, etc."

The property owner has long had the burden of proof to establish the precise scope and extent of any release. *Maryland Brick Co. of Baltimore City v. Dunkerly*, 85 Md. 199, 213, 36 A. 761 (1897). The Greens failed to meet that burden when it did not prove to the trial court which buildings or what materials had been released. Whether or not Rollin' could "figure it out" is irrelevant. Certainly material providers should ensure the accuracy of any lien release they sign, but the deliberate purpose of the mechanics' lien law is to establish property owners as a second or "back-up" source of payment for the unpaid material provider since it is the owners who receive the ultimate benefit of the materials, and who, as a practical matter, control the cash. *Hill v. Parkway Indus. Center*, 49 Md.App. 676, 678, 435 A.2d 472 (1981). The trial court correctly maintained the lien against the Lexington Park project.

We note, however, that Norton's testimony reveals that Rollin' did execute a release on some of the materials delivered:

"[Defendant's Attorney]: Do you know who put that handwriting on [the lien release]?

[Norton]: I did.

Q: What did you—why did you put that on there?

A: Due to the fact I could not release a lien on that particular building because it was not completed. I could not sign a release of lien on a building that was not completed.

Q: You would put down how much you are releasing?

A: Yes.

Q: One shows Building [7–33] squares or something like that. Those you are [sic] putting down how much you were releasing?

A: Right."

Although the three general lien releases are too vague to have any effect, the releases with Norton's handwritten notations, combined with his testimony, were specific enough to be effective. Rollin' released 66 squares in the

third release and 41 squares in the fifth release, a total of 107 squares. Thus, of the 773 squares delivered to the project, Rollin' can establish a lien for only 666 squares of siding.

### Accounting Procedures

■ The Greens next complains that Rollin' was required to separate the three projects, and to credit the proper project as indicated on the check stub, rather than simply to credit Lundberg's account on a first-in-first-out (FIFO) basis. Rollin' maintains that it could allocate the check funds under the FIFO accounting method in the absence of directions to the contrary by the debtor, Lundberg.

The proper allocation of credits to an account in the context of the mechanic's lien was explained by Judge Collins in *T. Dan Kolker, Inc. v. Shure,* 209 Md. 290, 301–302, 121 A.2d 223 (1956):

> "Of course, it is true as a general rule that the debtor has the right, if he so elects, to make the application of payments in the first instance and, if he omits to do so, the creditor may make the appropriation. If neither make any appropriation, the law appropriates the payment according to the justice of the case and usually to the payment of the earliest and most onerous debt." (citations omitted).

*See also German Lutheran Church v. Heise,* 44 Md. 453, 471 (1873); *Clark–King Constr. v. Salter,* 269 Md. 494, 500, 307 A.2d 485 (1973).

The fact that the materials were furnished for three separate projects, although Lundberg had only one account with Rollin', does not affect the outcome. In *Bounds v. Nuttle,* 181 Md. 400, 30 A.2d 263 (1943), the material providers had paid off the contractor's old debts owed them on *other* jobs before applying the owner's payments to the materials used in the owner's project. The Court of Appeals held:

> "If the contractors did not use part of the money received by them from the [owners] to pay bills which they owed

to the [material providers], this was entirely within their rights, and it was also *entirely within the rights of the [material providers] to receive this money and credit it on old bills,* provided there was no arrangement or agreement that this was done for the purpose of permitting the [material providers] to collect again by means of a lien from the [owners]." (emphasis supplied).

181 Md. at 407, 30 A.2d 263. Lundberg, the debtor-subcontractor, occupies the same position as the debtor-contractor in *Bounds*. Thus, the breakdown of payment by project made on the check stubs issued by Case Edwards is irrelevant—Case Edwards was not the debtor and could not direct the manner of payment to Lundberg's account. The evidence shows that Lundberg did not instruct Rollin' to credit his account in any particular manner or to direct payments to certain bills. Furthermore, The Greens made no allegations of collusive billing practices.

The Court of Appeals has since qualified the *Bounds* holding in *Dickerson Lumber Co. v. Herson*, 230 Md. 487, 187 A.2d 689 (1963). In *Dickerson*, the contractor had several accounts for various projects with the material provider, who was aware of the contractor's weak financial position. The Court found it significant that the material provider also knew that the joint checks it received originated from bank drafts (under the construction loan) for the Herson project:

"We think that it was clearly the duty of the [material supplier] and of its officers to apply funds received by [it] from [the contractor] known to have been derived from the Herson payments to the payment of charges against the Herson job rather than to apply such amounts to the payment of other indebtedness of [the contractor] to the [material supplier]."

230 Md. at 492, 187 A.2d 689. *Dickerson*, however, is factually inapposite. Lundberg had only one account with Rollin' and all funds were credited to that account. The evidence does not indicate that Rollin' knew the source of the funds distributed by Case Edwards. The owner's name,

The Greens at Hilton Run I Limited Partnership, did not appear on the checks or the check stubs. The parties, moreover, are the same[9] for all the projects, which would make it difficult, if not impossible, for Rollin' to trace the funds. We are not persuaded that the trial court was clearly erroneous in finding that Rollin' could use the FIFO accounting method when crediting payments to Lundberg's account.

### Estoppel

Finally, The Greens argues that Rollin' was estopped from raising non-payment and claiming a lien when it had full control of the checks. It claims the trial court erred in finding that Rollin' was only partially estopped to the extent that it did not pay itself first before paying Lundberg's third-party labor costs. Rollin' cross appeals, contending that it is entitled to the full amount of the lien.

Where the owners fail to take precautions against a contractor or subcontractor known to be in financial straits, the law does not protect them. In *Bounds v. Nuttle*, for instance, the owners signed a contract obligating "them to pay the contractors and the contractors alone" despite having notice that the contractors were "not taking care of bills for which liens might subsequently be laid." 181 Md. at 406, 30 A.2d 263. The Court of Appeals noted:

"If [the owners'] failure to protect themselves against an impecunious contractor causes them to have to pay twice for materials, it is their own fault. The mechanic's lien law was passed to cover just such a situation and to protect material men. The theory of it is that the owner gets the benefit of the material, and he has control of the money. If he negligently and carelessly pays the money out to the contractor without taking precautions to see

---

**9.** The Greens and Case Edwards Development Co., the partners comprising the limited partnerships, own the projects; Case Edwards Construction Co., the contractor, issued the checks; Lundberg is the sub-contractor hired to obtain and install the siding; and Rollin' is the vinyl siding and accessory provider.

that it is applied to the payment of the materials which go in the building, then he must stand the loss rather than the material man, who has no opportunity to protect himself once he has delivered the materials."

181 Md. at 406, 30 A.2d 263. *See also Dickerson Lumber Co. v. Herson, supra; N.S. Stavrou, Inc. v. Beacon Supply Co., Inc.*, 249 Md. 451, 240 A.2d 278 (1967).

The Greens, acting through Case Edwards, took precautionary measures to protect itself by virtue of the joint check arrangement.[10] After May 2, 1988, furthermore, the checks were given to Rollin' rather than Lundberg, as they had been previously. This arrangement also gave Rollin' the means to protect itself, as it then controlled distribution of the checks. The events of the May 2, 1988 meeting, and the subsequent meetings in which Rollin' mediated between Case Edwards and Lundberg, show that both The Greens and Rollin' were well aware of Lundberg's precarious financial position.

Ordinarily, Rollin' would be estopped from establishing a mechanic's lien. In this case, however, Rollin' was also obligated to pay Lundberg's third-party labor costs under the May 2 agreement. In a similar joint check case, the Court of Appeals found that the material provider (Beacon Supply) in *N.S. Stavrou, Inc. v. Beacon Supply Co., Inc., supra,* was also charged, albeit impliedly, with paying the subcontractor's (Densco, Inc.) labor costs under a joint check agreement. The same contractor, subcontractor and material provider were involved in three school construction projects. Beacon Supply had petitioned to establish a mechanic's lien against Stavrou, the contractor. Stavrou ar-

---

**10.** An owner can protect itself by any of the following methods: 1) directly contracting with the material supplier through a construction manager 2) paying the material supplier directly, 3) paying the contractor and material supplier by joint check, 4) requiring the contractor to obtain a standard form labor and materials bond, 5) obtaining a lien release or lien waiver from the material supplier, etc. *See* MICPEL, Mechanic's Liens & Maryland Trust Fund Law, pp. 64–72 (rev. ed. 1988).

gued that Beacon had to bear the loss when Beacon applied the check proceeds only towards payment for materials which it had supplied, giving the rest to the subcontractor, when it was within its power and control to apply the proceeds to future payments. The Court of Appeals found this argument unpersuasive:

> "[H]ow then ... could Stavrou [the contractor] have reasonably expected Densco to survive from April 9, 1964, the date of the first billing, to September 23, 1964, the date of the last billing, a period in excess of 5 months, if Densco was not to receive any reimbursement for money expended on labor? How was Densco to keep its work force intact and meet its operating expenses?"

249 Md. at 455, 240 A.2d 278.

In this case, the parties stipulated that Rollin' received $72,494.20 for the Lexington Park project. Lundberg was paid $37,694.80 for labor. The lower court ruled:

> "Upon receipt of each Case Edward check, [Rollin'] was entitled to take out all amounts then due it on account of the Lexington Park job, and the other two jobsites as well. That it chose to maintain, as did its counterpart, Case Edward, a payment to Duane Lundberg for his labor submittals, it is at fault."

The $46,380 lien in favor of Rollin' was therefore reduced by $28,604, the amount attributable to labor on the Lexington Park project, to $17,776. In effect, the trial judge ruled that Rollin' was estopped as to *any* payment it made toward Lundberg's labor costs *before* the Lundberg account had been paid in full. By May 2, Lundberg's account totalled $95,137.78 for all three projects, including one month of deliveries to Lexington Park. Rollin' would have had to receive over $95,000 in payments before any of Lundberg's third party labor costs were met. At the time of trial Rollin' was still owed $33,372.35. Quite obviously, none of Lundberg's labor costs would have been paid.

Unlike the contractor in *Stavrou,* Case Edwards agreed that Lundberg's labor costs were to be paid in the May 2 meeting. The purpose of the joint check arrangement after

that date was clearly for the mutual protection of the three entities (Case Edwards, Lundberg, and Rollin') involved in the same multifamily housing projects. The arrangement denied Lundberg his profit, but kept him on the job so that 1) the projects would be completed, and 2) the arrearage on his Rollin' account would be paid. It is certain that the parties did not intend Rollin' to protect itself exclusively—if it had, no labor costs would have been paid, the vinyl siding would not have been installed, and the projects would not have been completed. In the absence of any clear directions as to how the checks were to be distributed, Rollin' was entitled to allocate the funds in a reasonable manner. The evidence showed that Norton would try to ascertain how many squares Lundberg had installed the week before (labor), and how many squares the check applied to (materials). The amount given to Lundberg was based on the reasonableness of the labor costs balanced against the need for Rollin' to reimburse itself for materials. Rollin' reasonably distributed the funds in accordance with the purposes of the joint check arrangement.

As a result, The Greens cannot prevail in its assertion that Rollin' was estopped from raising nonpayment and claiming a lien. Notwithstanding its full control of the disbursement of funds, it was under an obligation, agreed to by all pertinent parties, to take reasonable measures to keep Lundberg afloat and not to cause work on all projects to collapse. For precisely the same reasons that The Greens cannot prevail on this estoppel argument, Rollin' is entitled to prevail (in major measure) on its cross-appeal. Except to the extent that several specific releases reduced its lien from one of 773 squares to one of 666 squares of siding, it was entitled to assert its full lien in the amount of $39,960.

*AFFIRMED IN PART; REVERSED IN PART AND REMANDED TO THE CIRCUIT COURT FOR ST. MARY'S COUNTY WITH DIRECTIONS TO ESTABLISH A LIEN IN FAVOR OF APPELLEE–CROSS APPEL-*

*LANT IN THE AMOUNT OF $39,960.00; APPELLANT-CROSS APPELLEE TO PAY COSTS.*