**GEM PLUMBING & HEATING CO., INC.**

v.

**Robert V. ROSSI et al.**

**No. 2003–386–Appeal.**

Supreme Court of Rhode Island.

Feb. 22, 2005.

Thomas M. Petronio, Greenville, for Plaintiff.

Patrick J. Dougherty, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

WILLIAMS, Chief Justice.

Referencing his own inability to forecast the actions of World War II Russia, Winston Churchill once quipped "It is a riddle wrapped in a mystery inside an enigma." [1] Though we candidly admit the legal issues at play in this case do not come close to the terrorism of Stalinist Russia, the ensuing opinion answers the riddle wrapped in the mystery that is the Rhode Island Mechanics' Lien Law, found at G.L.1956 Chapter 28 of Title 34, as analyzed under the enigma that is the modern procedural due process jurisprudence growing out of both the Fourteenth Amendment to the United States Constitution and Article 1, Section 2 of the Rhode Island Constitution.

This case came before the Supreme Court on January 19, 2005, on appeal from a Superior Court judgment in favor of the property owners,[2] Robert V. Rossi and Linda A. Rossi (collectively Rossis), declaring that the Mechanics' Lien Law was so lean on due process protections that it rendered the statute unconstitutional. We wish to thank the Attorney General, the New England Legal Foundation, the American Subcontractors Association, Inc.,

the Rhode Island Subcontractors Association, and the Rhode Island Builders Association for their excellent amicus briefs. For the reasons stated herein, we vacate the judgment of the Superior Court.

## I

### Facts and Travel

In October 2000, the Rossis contracted with claimant,[3] Gem Plumbing & Heating Co., Inc. (Gem), to provide the materials and labor required for water and sewer lines in connection with an office building the Rossis were constructing in Smithfield, Rhode Island. On January 28, 2002, Gem mailed the Rossis a notice of intention to do work or furnish materials in connection with the building and recorded a copy of such notice in the land records in the Town of Smithfield, pursuant to § 34–28–4. As prescribed by statute, 120 days later, on May 28, 2002, Gem filed a petition to enforce the mechanic's lien in the Superior Court, claiming $35,500 in unpaid labor and materials. On the same day, Gem recorded a notice of lis pendens.

Subsequently, also in accordance with statutory procedure, the Rossis paid into the court registry $35,860, which equaled the total amount of Gem's claimed lien, plus costs. Thereafter the Rossis filed an *ex parte* motion to dissolve, release, and discharge the mechanic's lien and lis pendens, which the Superior Court granted on June 4, 2002, stating in its order that the amount deposited with the court registry

---

1. John Bartlett, *Familiar Quotations* 743 (15th ed. 1980).

2. In the interest of clarity, we will use the general term "property owner" to characterize the person or entity whose property interest has been affected by the prejudgment remedy, except when quoted authority has used a different term. The property owner otherwise would be known as the respondent, lienee, landowner, debtor, buyer or consumer.

3. Also in the interest of clarity, we will use the general term "claimant" to characterize the person or entity who seeks to employ the prejudgment remedy, except when quoted authority has used a different term. The claimant otherwise would be known as the petitioner, lienor, mechanic, materialman, creditor or seller.

was substituted forthwith for the mechanic's lien and lis pendens in the event that Gem eventually succeeded on the merits.

■ On August 29, 2000, the Rossis filed a motion to dismiss, alleging that the Mechanics' Lien Law was unconstitutional because it deprived them of their property without due process of law.[4] As required by Rule 24(d) of the Superior Court Rules of Civil Procedure, the Rossis informed the Attorney General of the constitutional claim, but the State declined to intervene. On October 23, 2002, after a hearing, the motion justice entered an order inviting the Attorney General and any other party to file amicus briefs, and required that notice of such invitation be given to major building and construction trade associations. After the Attorney General and various amici curiae submitted briefs, the court heard arguments on the constitutionality of the Mechanics' Lien Law. The motion justice then issued a written decision declaring the then-statute unconstitutional. The statute, however, has been amended since that written decision, and it is the amended statute that we ultimately review today.

In that written decision analyzing the pre-amendment statute, the motion justice relied heavily upon the United States Supreme Court's most recent procedural due process opinion addressing prejudgment remedies, *Connecticut v. Doehr*, 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991). Similar to the attachment procedure in *Doehr*, the motion justice found that a mechanic's lien clouds title; impairs the ability to sell property; taints any credit rating; reduces the chance of obtaining a home equity loan; and can place an existing mortgage in technical default.[5] The motion justice held that the "tremendous significance" of the property interest, when combined with his finding that the statutorily required sworn affidavit of the claimant was an inadequate safeguard to prevent the erroneous deprivation, significantly outweighed both a claimant's interest in a prejudgment remedy and the potential burden on the government if additional safeguards were to be required.

On May 30, 2003, the motion justice entered judgment in favor of the Rossis, dismissing the action and ordering that their funds be released from the court registry, with accrued interest. On the same day, the motion justice also issued an order staying the effect of the judgment

---

4. In the motion justice's decision and in papers before this Court, the term "taking" has been employed to describe the statute's effect on the Rossis' property rights. We wish to clarify that the constitutional claim invoked here is one of procedural due process, which is manifestly different from a "taking." The former prevents the "deprivation" of life, liberty, or property without due process. The latter provides protection from the government's power of eminent domain (or, in some circumstances, excessive regulation) such that when the government literally "takes" private property for public use, the property owner may allege "inverse condemnation" and, if successful, is entitled to "just compensation." This is not a "takings" case. *See, e.g., Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

5. The decision also referred to a footnote in *Connecticut v. Doehr*, 501 U.S. 1, 12 n. 4, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991), to limit the Supreme Court's earlier summary affirmance of a federal district court decision, *Spielman–Fond, Inc. v. Hanson's, Inc.*, 379 F.Supp. 997 (D.Ariz.1973), *aff'd mem.*, 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974), which held that the filing of a mechanic's lien did not amount to the deprivation of a significant property interest. The motion justice reasoned that *Doehr* precluded any reliance on *Spielman–Fond, Inc.*, stating "post-*Doehr*, there is no longer any valid argument that a mechanics' lien does not implicate a significant property interest."

for thirty days. On June 5, 2003, Gem filed its notice of appeal, as well as a motion to stay the judgment pending appellate review by this Court. Subsequently, the motion justice declined to make the stay indefinite, instead extending it to July 10, 2003. This Court later stayed the judgment pending further order. At present, the funds deposited by the Rossis remain in the court registry.

## II

### A

#### The Applicable Statute

After the motion justice declared the Mechanics' Lien Law unconstitutional, the Legislature amended the statute on July 17, 2003, by adding § 34–28–17.1.[6] Before determining the constitutionality of the Rhode Island Mechanics' Lien Law, we first must determine whether the pre-amendment statute or the post-amendment statute controls our analysis in this case.

■ Generally, if the Legislature amends or adds a statute relevant to a case that is pending appeal, this Court will apply "the law in effect at the time of the appeal," even when the statute was not in effect when judgment was entered in the trial court. *O'Reilly v. Town of Glocester*, 621 A.2d 697, 704–05 (R.I.1993); *accord Solas v. Emergency Hiring Council*, 774 A.2d 820, 826 (R.I.2001); *Dunbar v. Tammelleo*, 673 A.2d 1063, 1067 (R.I.1996). "This is particularly true when the legisla-

tive intent is retrospective." *Dunbar*, 673 A.2d at 1067.

■ Statutes are given retroactive effect only when the Legislature clearly expresses such an application. *Pion v. Bess Eaton Donuts Flour Co.*, 637 A.2d 367, 371 (R.I.1994). Section 34–28–17.1 applies, not only to all future mechanics' liens, but also to all pending "mechanics' liens, petitions or lien substitutions" as of July 17, 2003. P.L. 2003, ch. 269, § 2; P.L. 2003, ch. 299, § 2. This language clearly intends to apply § 34–28–17.1 both prospectively to future mechanics' liens and retrospectively to pending mechanics' liens.[7] Based on the clear language of the statute and our caselaw, we are required to apply the Mechanics' Lien Law as amended by § 34–28–17.1 to this appeal.

### B

#### The Mechanics of Mechanics' Liens

As we have said in the past, the Mechanics' Lien Law, having its roots in various predecessor statutes going back to 1847, has "never been a model of clarity." *Faraone v. Faraone*, 413 A.2d 90, 91 (R.I. 1980). Indeed, almost seventy years ago, in *Art Metal Construction Co. v. Knight*, 56 R.I. 228, 235, 185 A. 136, 139 (1936), this Court noted that "there is and for many years has been great uncertainty among the members of the legal profession in this state, as to the interpretation and application of the statute." Abraham Lincoln once said "[l]et nothing discourage or baffle you."[8] And so, "[d]onning our compass and machete, we venture into the thicket,"

---

**6.** For further discussion of the amended statute, *see infra* Part II.B.

**7.** We disagree with the Rossis' contention that the lien no longer is pending because they paid $35,860 into the registry of the Superior Court and the lien was released. This argument ignores the Legislature's intent to apply

G.L.1956 § 34–28–17.1 to all pending "lien substitutions." That payment is merely a lien substitution.

**8.** Abraham Lincoln, Letter to Elihu B. Washburne, (Apr. 30, 1848), *in A Treasury of Lincoln Quotations* 64 (Fred Kerner ed. 1965) (1996).

and attempt to navigate this difficult statute. *McKinney v. State*, 843 A.2d 463, 466 (R.I.2004).

The statute is in derogation of the common law, and, as such, strict compliance is required. *Art Metal Construction Co.*, 56 R.I. at 246, 185 A. at 144. Nonetheless, the statute should be construed to carry out its intended purpose to "afford a liberal remedy to all who have contributed labor or material towards adding to the value of the property to which the lien attaches." *Field & Slocomb v. Consolidated Mineral Water Co.*, 25 R.I. 319, 320, 55 A. 757, 758 (1903). The law was "designed to prevent unjust enrichment of one person at the expense of another." *Art Metal Construction Co.*, 56 R.I. at 246, 185 A. at 145.

Under § 34–28–1(a),

"Whenever any building, canal, turnpike, railroad, or other improvement shall be constructed, erected, altered, or repaired by oral or written contract with or at the oral or written request of the owner, the owner being at the time the owner of the land on which the improvement is located, * * * the building, canal, turnpike, railroad, or other improvement, together with the land, is hereby made liable and shall stand subject to liens for all the work done by any person in the construction, erection, alteration, or reparation of such building, canal, turnpike, railroad, or other improvement, and for the materials used in the construction, erection, alteration, or reparation thereof, which have been furnished by any person."

As interpreted by this Court, § 34–28–1(a) creates a lien in favor of the claimant "when the work begins or the materials are furnished * * * 'it accrues as the debt accrues, being incident to the improvement * * *.' " *Art Metal Construction Co.*, 56 R.I. at 235, 185 A. at 140. The lien, however, is not self-executing. To perfect the lien, the claimant must comply with a two-part process set forth in the statute: first, the mailing of a "notice of intention" to the property owner before or within 120 days after doing work or furnishing materials; and second, the recording of that "notice of intention" in the land records within 120 days after doing work or furnishing materials.[9] Section 34–28–4(a).

9. Referencing this Brobdingnagian section of the statute in *Faraone v. Faraone*, 413 A.2d 90, 91 (R.I.1980), we called it "a single sentence of gargantuan length." Section 34–28–4(a) states that any liens created by the statute are void unless:

"[B]efore or within one hundred and twenty (120) days after the doing of such work or the furnishing of such materials, [the claimant] mail[s] by prepaid registered or certified mail, in either case return receipt requested, a notice of intention, hereinafter described, to do work or furnish material, or both, together with a statement that the person so mailing may within one hundred twenty (120) days after the doing of the work or the furnishing of the materials, file a copy of such notice of intention in the records of land evidence in the city or town in which the land generally described in such notice of intention is located and a further statement that the mailing of the notice of intention and the filing of the copy will perfect a lien of the person so mailing against the land under and subject to the provisions of this chapter, to the owner of record of the land at the time of the mailing, or, in the case of a lien against the interest of any lessee or tenant, to the lessee or tenant, the mailing to be addressed to the last known residence or place of business of the owner or lessee or tenant, but if no residence or place of business is known or ascertainable by the person making the mailing by inquiry of the person with whom the person making the mailing is directly dealing or otherwise, then the mailing under this section shall be to the address of the land, and also shall before or within one hundred twenty (120) days after the doing of the work or the furnishing of the materials file a copy of the notice of intention in

Section 34–28–4(b) requires that the notice of intention be executed under oath and contain: (1) the name of the property owner; (2) "[a] general description of the land sufficient to identify it"; (3) "[a] general description of the nature of the work done or * * * materials furnished" (or to be done or furnished) and "the approximate value thereof * * * "; (4) the name and address of the person for whom the work was, or is to be done, or materials furnished; (5) the "name and address of the person mailing the notice" or his or her agent for purposes of the notice and underlying lien claimed; and (6) a statement that the person so mailing "has not been paid for the work done or materials furnished." Finally, the notice of intention must be mailed by registered or certified mail with return receipt requested. Section 34–28–4(a).

Notwithstanding the foregoing, a properly perfected lien under § 34–28–4(a) becomes "void and wholly lost" unless before 120 days from the recording of the notice of intention, the claimant files a notice of lis pendens [10] in the land records as well as a petition to enforce [11] the lien in Superior Court. Section 34–28–10(a).[12] The petition to enforce must be filed on the same day or within seven days after the filing of the notice of lis pendens, and both must be filed within 120 days of the date on which the notice of intention was recorded. *Id.*

the records of land evidence in the city or town in which the land generally described in the notice of lien is located. The mailing of the notice of intention and the filing of the copy in the land evidence records together with the mailing of another copy thereof as hereinbelow provided shall perfect, subject to other sections of this chapter, the lien of the person so mailing and filing as to work done or materials furnished by the person during the one hundred and twenty (120) days prior to the mailing and thereafter * * *."

10. The notice of lis pendens must contain: (1) "[t]he name of the person against whom the petition has been or will be filed and the relationship" to the land in question; (2) "[a] description of the land by metes and bounds, or by reference to a recorded plat, by tax assessor's lot and plat, or by other legal description"; (3) the amount claimed to be due in the petition; (4) the dates of the mailing and filing of the notice of intention and the name and address of the person to whom it was mailed; and (5) the names and addresses of the claimant and his or her attorney. The notice of lis pendens must state that the person filing has filed or will file within seven days, a petition to enforce in the Superior Court. Section 34–28–11(a).

11. The petition to enforce must:
"set forth the particulars of the account or demand for which the petitioner claims a lien including the amount claimed, extras,

payment made, the date or dates upon which work was done or materials furnished, shall recite the actions taken under this chapter by the petitioner for the perfection of such lien, shall particularly describe the * * * improvement, and land, and the estate and title in the improvement upon which the petitioner claims a lien. It shall include specific dates of performance of the work, providing of materials, nature of each performance, and shall pray that the lien may be enforced against the improvement * * *." Section 34–28–13.

12. In pertinent part, § 34–28–10(a) states that all liens under the statute:
"shall be void and wholly lost to any person claiming a lien under those sections, unless the person shall file a petition to enforce the lien, described in § 34–28–13, in the superior court for the county in which is situated the land upon which the * * * improvement is being or has been constructed, erected, altered, or repaired, and unless such person shall also file in the records of land evidence in the city or town in which such land is located a notice of lis pendens, * * * the petition to be filed on the same day as the notice of lis pendens, or within seven (7) days thereafter, and both the petition and the notice of lis pendens to be filed within one hundred twenty (120) days of the date of the recording of the notice of intention provided in § 34–28–4 * * *."

At the time of the motion justice's judgment on May 30, 2003, and before the amendment to the statute, the Rossis had precious few avenues for relief from a perfected lien. Pursuant to § 34–28–17, property owners could deposit a bond (or cash) equivalent to the total amount of the notice of intention (plus associated costs) into the court registry and then petition the Superior Court *ex parte* to discharge the notice of intention and lis pendens, thereby clearing title to the property. Under § 34–28–17, this option is available to the property owner at any time after the recording of the notice of intention or, alternatively, after the filing of a petition to enforce. Of course, the property owner, as respondent to the petition in Superior Court, may contest both the lien itself and the amount claimed on their merits, although the statute is unclear as to exactly *when* that contest shall be heard. Section 34–28–20. Finally, a property owner prevailing on the merits may be entitled to costs, and, in the court's discretion, attorneys' fees. Section 34–28–19.

However, P.L. 2003, ch. 269, § 1 (codified as § 34–28–17.1) enacted on July 17, 2003, significantly enhanced the rights of a property owner facing a mechanic's lien. In relevant part, § 34–28–17.1(a) provides that any owner, contractor, or other interested party who alleges:

"(1) that any person who has provided labor, materials or equipment or has agreed to provide funding, financing or payment for labor or materials or equipment refuses to continue to provide such funding, financing or payment for labor materials [sic] solely because of the filing or recording of a notice of intention; or (2) it appears from the notice of intention that the claimant has no valid lien by reason of the character of or the contract for the labor, materials or equipment and for which a lien is claimed; or (3) that a notice or other instrument has not been filed or recorded in accordance with the applicable provisions of § 34–28–1 et seq.; or (4) that for any other reason a claimed lien is invalid by reason or [sic] failure to comply with the provisions of § 34–28–1 et seq., then in such event, such person may apply *forthwith* to the superior court for the county where the land lies for an order to show cause why the lien in question is invalid, or otherwise void, or the basis of the lien is without probability of a judgment rendered in favor of the lienor." (Emphasis added.)

Section 34–28–17.1(b) provides that such a show-cause order "shall be served upon the necessary parties no later than one week prior to the date of the scheduled hearing."

### III

### The United States Supreme Court and Procedural Due Process

The United States Supreme Court's modern procedural due process jurisprudence, as applied to prejudgment remedies, began with *Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). The *Sniadach* Court analyzed a Wisconsin statute permitting the garnishment [13] of wages based on a request made to the court clerk. *Id.* at 338, 89 S.Ct. 1820. The statute did not require prior notice to the wage earner, but rather required service of a summons and complaint within ten days after service on the garnishee. *Id.*

---

**13.** Garnishment is a "judicial proceeding in which a creditor (or potential creditor) asks the court to order a third party who is indebted to * * * the debtor to turn over to the creditor any of the debtor's property (such as wages or bank accounts) held by that third party." Black's Law Dictionary 702 (8th ed. 1999).

The *Sniadach* Court held that the pre-judgment garnishment of wages, though perhaps justifiable in "extraordinary situations," *id.* at 339, 89 S.Ct. 1820, "violate[d] the fundamental principles of due process," *id.* at 342, 89 S.Ct. 1820.

Three years later, in *Fuentes v. Shevin*, 407 U.S. 67, 69, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the United States Supreme Court scrutinized two similar replevin[14] statutes, one from Florida and the other from Pennsylvania.[15] In both cases, property owners had purchased consumer goods under installment sales contracts, defaulted on those contracts, and then had those goods seized pursuant to writs of replevin without prior notice or hearing. *Id.* at 70–71, 92 S.Ct. 1983. Both statutes did offer some procedural safeguards limiting the risk of erroneous deprivation: a bond requirement; conclusory allegations made to a court clerk that the claimant is entitled to those specific goods; and the possibility of suit by the property owner for damages for the wrongful seizure of goods. *Id.* at 83, 92 S.Ct. 1983. Finding those safeguards inadequate, the *Fuentes* Court held that the "replevin provisions work a deprivation of property without due

process of law insofar as they deny the right to a prior opportunity to be heard before chattels are taken from their possessor."[16] *Id.* at 96, 92 S.Ct. 1983.

The United States Supreme Court next reviewed a Louisiana sequestration[17] statute in *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). Similar to *Fuentes*, a claimant used a pre-judgment remedy to seize goods after a property owner had defaulted on an installment sales contract. *Mitchell*, 416 U.S. at 601, 94 S.Ct. 1895. The sequestration statute allowed for the seizure of the goods, without prior notice or hearing, upon the claimant's sworn affidavit, *ex parte* judicial review of that affidavit, and the claimant's posting of a bond. *Id.* at 602, 94 S.Ct. 1895. The property owner then could move immediately to dissolve the writ at a subsequent hearing, at which the claimant must prove it was entitled to the prejudgment seizure. *Id.* at 606, 610, 94 S.Ct. 1895. The United States Supreme Court interpreted *Sniadach* and *Fuentes* narrowly for the proposition "that a hearing must be had before one is *finally* deprived of his [or her] property" because those cases did not "deal at all with

14. Replevin is an "action for the repossession of personal property wrongfully taken or detained by the defendant, whereby the plaintiff gives security for and holds the property until the court decides who owns it." Black's Law Dictionary 1325 (8th ed. 1999).

15. The primary difference between the two statutes was that the Florida statute provided a post-deprivation hearing, while the Pennsylvania statute did not "require that there *ever* be opportunity for a hearing on the merits of the conflicting claims to possession of the replevied property." *Fuentes v. Shevin*, 407 U.S. 67, 77, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

16. Based on *Fuentes*, the United States District Court for the District of Rhode Island declared the Rhode Island attachment statute,

G.L. 1956 chapter 5 of title 10, unconstitutional. *McClellan v. Commercial Credit Corp.*, 350 F.Supp. 1013, 1014 (D.R.I.1972). Rhode Island then amended both the attachment statute, § 10–5–2, and Rule 4 of the Superior Court Rules of Civil Procedure to comply with due process. *Martin v. Lincoln Bar, Inc.*, 622 A.2d 464, 467 (R.I.1993). This Court later held a separate section of the statute, § 10–5–5, to be unconstitutional. *Shawmut Bank of Rhode Island v. Costello*, 643 A.2d 194, 199, 202 (R.I.1994) (noting that said section had "purportedly escaped significant review or amendment" post-*Fuentes*).

17. Sequestration is the "process by which property is removed from the possessor pending the outcome of a dispute in which two or more parties contend for it." Black's Law Dictionary 1397 (8th ed. 1999).

the need for a pretermination hearing where a full and immediate post-termination hearing is provided." *Id.* at 611, 94 S.Ct. 1895 (emphasis added). Emphasizing the nature of the claimant's interest in the property and corresponding lien, *id.* at 607–10, 94 S.Ct. 1895, the United States Supreme Court held that the Louisiana sequestration statute was constitutional, *id.* at 619, 94 S.Ct. 1895.

The United States Supreme Court then examined a Georgia garnishment statute in *North Georgia Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). In seeking payment for goods sold and delivered, the claimant filed an affidavit and bond seeking to garnish funds in the property owner's bank account. *Id.* at 604, 95 S.Ct. 719. The garnishment statute required an affidavit to be filed with a court clerk, or "some officer authorized to issue an attachment," alleging nonpayment, required the claimant to post a bond, and allowed the property owner to dissolve the garnishment by posting a counterbond to satisfy any future judgment in favor of the claimant. *Id.* at 602–03 & n. 1, 95 S.Ct. 719. The statute, however, did not provide for an immediate post-deprivation hearing "to demonstrate at least probable cause for the garnishment." *Id.* at 607, 95 S.Ct. 719. Distinguishing *Mitchell* on the grounds that the garnishment was issued without *ex parte* judicial review and that the statute did not provide for an immediate post-deprivation hearing, the United States Supreme Court declared that the garnishment statute violated the Due Process Clause. *Di–Chem, Inc.,* 419 U.S. at 605, 607–08, 95 S.Ct. 719.

The United States Supreme Court's most recent procedural due process case analyzed a state attachment [18] procedure in *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991). After a physical altercation, the claimant, who was the plaintiff in an assault and battery civil action, sought to attach the defendant's home to secure the potential judgment. *Id.* at 6–7, 111 S.Ct. 2105. Without prior notice or hearing, *id.* at 5, 111 S.Ct. 2105, the attachment statute allowed for the attachment of another's real property after judicial review of an affidavit demonstrating probable cause to believe the claimant will win a judgment in the underlying civil claim, *id.* at 5–7, 111 S.Ct. 2105. Though the claimant was not required to post a bond, *id.* at 6, 111 S.Ct. 2105, the property owner could avail himself of a post-deprivation hearing to challenge the attachment, *id.* at 7, 111 S.Ct. 2105. Recognizing that the effect of the attachment of real property was not a "complete, physical, or permanent deprivation of real property" and, therefore, "less than the perhaps temporary total deprivation" found in earlier cases, *id.* at 12, 111 S.Ct. 2105, the *Doehr* Court nonetheless held that the effects of the attachment, primarily the clouding of title, deprived the property owner of a "significant" property interest, *id.* at 11, 111 S.Ct. 2105. This, however, did not end the inquiry. The *Doehr* Court proceeded to apply a balancing test [19] and concluded that the *ex parte* judicial review of the affidavit, and the post-deprivation hearing, *id.* at 14–15, 111 S.Ct. 2105, were insufficient to offset the property owner's significant property interest as compared with the claimant's *de minimis* interest in the other's real property, *id.* at 16, 111 S.Ct. 2105.[20] Accordingly, the United States Su-

---

18. Attachment is the "seizing of a person's property to secure a judgment or to be sold in satisfaction of a judgment." Black's Law Dictionary 136 (8th ed. 1999).

19. For further discussion of the balancing test, *see infra* Part IV.B.

20. The *Doehr* Court was careful to draw distinctions between the nature of a plaintiff's rights in a tort action and a creditor's right in

preme Court held that the Connecticut attachment statute violated the Due Process Clause. *Id.* at 24, 111 S.Ct. 2105.

In holding as it did on the issue of whether the clouding of title affected a significant property interest, the *Doehr* Court limited the precedential value of its own summary affirmance of *Spielman–Fond, Inc. v. Hanson's, Inc.,* 379 F.Supp. 997, 999 (D.Ariz.1973), *aff'd mem.,* 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974), which held that the filing of a mechanic's lien did not deprive a claimant of a significant property interest. *Doehr,* 501 U.S. at 12 n. 4, 111 S.Ct. 2105. Concluding that *Spielman–Fond, Inc.* has less value as precedent because of its summary disposition, the *Doehr* Court noted that "[t]he facts of *Spielman–Fond* presented an alternative basis for affirmance in any event." *Id.* Since a claimant in a mechanic's lien case had "a pre-existing interest in the property at issue," the "heightened" preexisting interest could "provide a ground for upholding procedures that are otherwise suspect." [21] *Id.*

## IV

### Analysis

■ In reviewing the constitutionality of statutes, "[t]he Legislature is presumed to have acted within its constitutional power." *Burrillville Racing Association v. State,* 118 R.I. 154, 157, 372 A.2d 979, 982 (1977). "This [C]ourt will attach 'every reasonable intendment in favor of * * * constitutionality' in order to preserve the statute." *Lynch v. King,* 120 R.I. 868, 875, 391 A.2d 117, 121 (1978) (quoting *Prata Undertaking*

Co. v. State Board of Embalming and Funeral Directing, 55 R.I. 454, 461, 182 A. 808, 811 (1936)). The party challenging such constitutionality bears the burden of proving that the statute is unconstitutional. *Rhode Island Insurers' Insolvency Fund v. Leviton Manufacturing Co.,* 716 A.2d 730, 734 (R.I.1998). The challenger must prove beyond a reasonable doubt that the statute is unconstitutional. *Id.*

## A

### State Action

■ Before reaching the procedural due process issue, we first must address Gem's argument that mechanics' liens do not involve state action and, thus, are not subject to the Fourteenth Amendment. "[T]he mere existence of a body of property law in a State, whether decisional or statutory," does not suffice as state action under the Fourteenth Amendment. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 160 n. 10, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). In its most recent review of a prejudgment remedy under procedural due process, however, the United States Supreme Court directly addressed state action:

"[p]rejudgment remedy statutes ordinarily apply to disputes between private parties rather than between an individual and the government. Such enactments are designed to enable one of the parties to 'make use of state procedures *with the overt, significant assistance of state officials,*' and they *undoubtedly involve state action 'substantial enough to implicate the Due Process Clause.*'"

---

an action on a debt. "[D]isputes between debtors and creditors more readily lend themselves to accurate *ex parte* assessments of the merits. Tort actions, like the assault and battery claim at issue here, do not." *Doehr,* 501 U.S. at 17, 111 S.Ct. 2105.

**21.** Chief Justice Rehnquist's concurrence in *Doehr,* joined by Justice Blackmun, further articulated the alternative basis for affirming *Spielman–Fond, Inc. See infra* Part IV.B.3.

*Doehr*, 501 U.S. at 10–11, 111 S.Ct. 2105 (emphases added).

Government officials provide "overt, significant assistance" in almost every step of the mechanics' lien process. A town official records the notice of intention perfecting the lien. Section 34–28–5. A town official records the notice of lis pendens. Section 34–28–12. Prior to a show-cause hearing to determine whether the lien should be enforced for the amount claimed, a Superior Court clerk has a newspaper advertisement published giving notice to "all persons having a lien, by virtue of this chapter, or any title, claim, lease, mortgage, attachment, or other lien or encumbrance, or any unrecorded claim on all or any part of the same property" and issues direct citations to each person listed on the petition to enforce the lien. Section 34–28–14. Finally, the court registry holds the cash payment or bond in the event the property owner wishes to discharge the lien. Section 34–28–17. Thus, the operation of our Mechanics' Lien Law qualifies as state action within the broad sweep of *Doehr*.

## B

### *Mathews–Doehr* Balancing

■ The Fourteenth Amendment to the United States Constitution prevents states from depriving "any person of life, liberty, or property, without due process of law." [22] Article 1, Section 2, of the Rhode Island Constitution similarly provides "[n]o person shall be deprived of life, liberty or property without due process of law." Due process is unlike other legal rules in that it " 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' " *Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Id.*

■ To determine whether a particular state statute complies with due process, we apply a balancing test first announced in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), as modified for prejudgment remedy purposes in *Doehr*, 501 U.S. at 10–11, 111 S.Ct. 2105. We balance: (1) the "consideration of the private interest that will be affected by the prejudgment measure"; (2) "an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards"; and (3) giving "principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." *Id.* at 11, 111 S.Ct. 2105.

### 1

### The Rossis' Interest

■ The first step in our *Mathews–Doehr* analysis requires us to consider the

---

22. For the sake of clarity, we note that the Due Process Clause contained in the Fifth Amendment to the United States Constitution does not pertain to this case. The United States Supreme Court consistently has applied the Fourteenth Amendment, rather than the Fifth Amendment, to the states in review of statutes affording prejudgment remedies. *See Doehr*, 501 U.S. at 4, 111 S.Ct. 2105; *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 601, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes*, 407 U.S. at 70, 92 S.Ct. 1983. The Fifth Amendment Due Process Clause, in contrast, applies to the federal government. *See Reardon v. United States*, 947 F.2d 1509, 1510 (1st Cir.1991) (en banc). Since the Fourteenth Amendment procedural Due Process Clause applies directly to the states, an application of the Fifth Amendment Due Process Clause to the states through the incorporation theory is redundant and unnecessary.

significance of the "private interest that will be affected by the prejudgment measure." *Doehr*, 501 U.S. at 11, 111 S.Ct. 2105. Discussing the effect of prejudgment attachment, the *Doehr* Court stated:

"the property interests that attachment affects are significant. For a property owner like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause." *Id.*

At least so far as its effect on the Rossis' property is concerned, we discern no meaningful difference between the attachment statute at issue in *Doehr* and the mechanic's lien in the present case. In both cases the property owner maintains physical possession of the property and has the option of clearing title by posting bond. In both cases, however, the deprivation is significantly less than the "temporary total deprivation[s]" in *Sniadach* (garnishment), *Fuentes* (replevin), and *Mitchell* (sequestration). *See Doehr*, 501 U.S. at 12, 111 S.Ct. 2105. Nonetheless, the Rossis experienced the same clouding of title as the *Doehr* property owners.

Gem urges application of the United States Supreme Court's summary affirmance of *Spielman–Fond, Inc.*, 379 F.Supp. at 999–1000, which held that a mechanic's lien did not amount to a deprivation of property significant enough to violate the Due Process Clause by failing to provide a pre-deprivation hearing. For purposes of the first prong of the *Mathews–Doehr* balancing test, however, the *Doehr* majority rejected *Spielman–Fond, Inc.* even though they had affirmed it in 1974. *Doehr*, 501 U.S. at 12 n. 4, 111 S.Ct. 2105 (stating *Spielman–Fond, Inc.* "does not control"). Accordingly, we reject Gem's assertions that no significant property interest is invoked by filing a mechanic's lien.

## 2

### The Risk of Erroneous Deprivation

The second prong of the *Mathews–Doehr* balancing test examines "the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards." *Doehr*, 501 U.S. at 11, 111 S.Ct. 2105. The Mechanics' Lien Law, as amended, offers the following procedures to limit the risk of erroneous deprivation: a prompt post-deprivation hearing; a detailed sworn affidavit; the property owner's ability to pay cash or post a bond to clear title; and the payment of costs and fees to the prevailing party. Since no single procedural safeguard guarantees compliance with due process, we will discuss each *seriatim* against the backdrop of the bad faith or "blackmail" factual scenario that the Rossis stressed in their brief:

"Many times, a contractor or materialman has been paid a substantial majority portion of the total amount contracted for and then a problem arises whereby there is a dispute as to the remaining amount owed or even as to the performance under the contract. Oftentimes the dispute arises where there are allegations of misfeasance, malfeasance or simply nonfeasance as to duties of performance under the contract of construction and the owner claims he/she has been damaged in an amount exceeding any amounts due and remaining to be paid under the contract price."

### i

### Hearing Pursuant to § 34–28–17.1

A prompt post-deprivation hearing is an important factor in determin-

ing whether the procedural safeguards adequately limit erroneous deprivation; it allows the property owner to immediately challenge the deprivation. The fact that a property owner could move immediately to dissolve the writ weighed in favor of constitutionality in *Mitchell*, 416 U.S. at 610, 94 S.Ct. 1895. The *Mitchell* Court clearly did not require a pre-deprivation hearing in stating "[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination is adequate." *Id.* at 611, 94 S.Ct. 1895 (quoting *Phillips v. Commissioner*, 283 U.S. 589, 596–97, 51 S.Ct. 608, 75 L.Ed. 1289 (1931)). In contrast, the existence of a post-deprivation hearing was insufficient to cure the constitutional defects in *Doehr*, 501 U.S. at 14–16, 111 S.Ct. 2105. Section 34–28–17.1 is a recent amendment; we shall interpret its language pursuant to the well-settled rules of statutory interpretation.

 "When the language of a statute is clear and unambiguous, we must enforce the statute as written by giving the words of the statute their plain and ordinary meaning." *Harvard Pilgrim Health Care of New England, Inc. v. Gelati*, 865 A.2d 1028, 1037 (R.I.2004). "But when the statute is ambiguous, we must apply the rules of statutory construction and examine the statute in its entirety to determine the intent and purpose of the Legislature." *Id.* In addition, "where the statute is remedial, one which affords a remedy, or improves or facilitates remedies already existing for the enforcement of rights or redress of wrongs, it is to be construed liberally." *Ayers–Schaffner v. Solomon*, 461 A.2d 396, 399 (R.I.1983).

The language of § 34–28–17.1 clearly affords a property owner a hearing "for an order to show cause why the lien in question is invalid, or otherwise void, or the basis of the lien is without probability of a judgment rendered in favor of the lienor." The question of *when* that hearing is to take place is critical in limiting the risk of erroneous deprivation: the more prompt the hearing, the less the risk of erroneous deprivation.

 At least as to subsections (2)-(4) of § 34–28–17.1(a),[23] the statute demonstrates clear legislative intent to grant a property owner a *prompt* post-deprivation hearing based on "the notice of intention," § 34–28–17.1(a)(2), which is the initial step in the process, § 34–28–4. Furthermore, the Legislature designated such hearings as expedited show-cause proceedings. *See* Black's Law Dictionary 1413 (8th ed. 1999) (defining "show-cause proceeding" as an "expedited proceeding on a show-cause order"). In addition, the statute provides a

---

**23.** As for § 34–28–17.1(a)(1), we point out that the Legislature may wish to clarify this subsection. According to the text of this provision, an owner, contractor, or other person of interest may attack the validity of the lien by an order to show cause when

"any person who has provided labor, materials or equipment or has agreed to provide funding, financing or payment for labor or materials or equipment refuses to continue to provide such funding, financing or payment for labor materials solely because of the filing or recording of a notice of intention." *Id.*

It appears the Legislature inadvertently left out people supplying "labor, materials or equipment" from those whose work stoppage give interested parties cause to challenge the validity of the lien, despite their presence in the first part of the subsection.

We also note that although the title of this section is "[d]ismissal of petition for other cause," that title does not affect our interpretation of the plain meaning of the statute; a lien may be challenged upon the notice of intention. Section 34–28–17.1. "The title of an act may only aid in a court's interpretation if there is doubt as to the meaning of a provision of the statute." *Town of East Greenwich v. O'Neil*, 617 A.2d 104, 109 (R.I. 1992).

service timeline that is faster than for a run-of-the-mill motion hearing. *Compare* § 34–28–17.1(b) (seven days prior to a hearing) *with* Super.R.Civ.P. 6(c) (ten days prior to a hearing). Finally, the Legislature's selection of the word "forthwith" in conjunction with its choice of the show-cause procedures and expedited return date indicates a clear intention that the Superior Court fast-track such hearings. Section 34–28–17.1(a). Thus, consistent with our rules of construction, we interpret this remedial statute to provide a property owner (as well as a contractor or other person of interest), *at any time after the mailing of the notice of intention*—and, significantly, *potentially before the lien is perfected*—the opportunity to challenge the claimed lien on a number of grounds, including its substantive invalidity, or for some other procedural defect under the statute.[24] We further conclude the Legislature intended for such actions to be given priority on the Superior Court calendar so that property owners indeed may bring

their challenges "forthwith" and be heard "forthwith."

Even when the notice of intention is mailed and recorded in the land evidence records on the same day, a property owner's right to a prompt post-deprivation hearing, pursuant to § 34–28–17.1, affords him or her considerable due process protection.[25] Thus, the prompt post-deprivation hearing weighs in favor of a finding of constitutionality.

Finally, we pause to acknowledge an especially peculiar facet of this case. Although our caselaw clearly establishes that we must apply the amended statute on appeal, we note that § 34–28–17.1 did not exist at the time the motion justice analyzed the constitutional question we address today.

### ii

### Other Procedural Safeguards Afforded

■ Among the other procedural safeguards analyzed under this prong is the

---

24. At oral argument, we raised the question of whether the amended statute places the burden of proof on either the property owner or the claimant at a hearing pursuant to § 34–28–17.1. Clearly, the property owner bears the initial burden of moving for the hearing. Section 34–28–17.1(a)(4) ("[A]ny person in interest, including, but not limited to, an owner or contractor * * * may apply forthwith * * * for an order to show cause * * *.").

Who bears the actual burden of proof at the hearing is less clear. The statute specifically labels the hearing as "an order to show cause." *Id.* The statute then modifies "an order to show cause" with the phrase "why the lien in question is invalid, or otherwise void, or the basis of the lien is without probability of a judgment rendered in favor of the lienor" suggesting the burden is placed on the property owner to prove that the lien is invalid. *Id.* In contrast, subsection (b) reads "An order of notice to appear and show cause why the relief demanded in the complaint should not be granted" suggesting the burden is placed on the claimant to prove that the lien is valid. Section 34–28–17.1(b). Given the

remedial nature of the statute, we resolve this discrepancy in favor of the property owner and conclude that the burden at the ensuing "show cause" hearing is on the claimant to prove why the lien is valid.

25. The fact that, pursuant to § 34–28–4, a claimant may mail the notice of intention before perfecting the lien is worthy of further note. Except when the notice of intention is mailed and filed on the same day, the property owner necessarily has some *prior* notice of the future encumbrance. Thus, mechanics' liens may be distinguishable from many of the other prejudgment remedies examined by the United States Supreme Court, which reviewed statutes affording prejudgment remedies without *notice and an opportunity to be heard. See Mitchell*, 416 U.S. at 601, 94 S.Ct. 1895; *Fuentes*, 407 U.S. at 70, 92 S.Ct. 1983. Furthermore, if the property owner avails himself or herself of a hearing promptly upon receipt of a notice of intention, then he or she could receive prior notice and an opportunity to be heard on the future encumbrance.

so-called "detailed affidavit." Certain sworn affidavits have been held insufficient to support constitutionality of prejudgment remedy statutes on multiple occasions. *Doehr*, 501 U.S. at 6, 14, 111 S.Ct. 2105 (describing the affidavit as "five one-sentence paragraphs"); *Di–Chem, Inc.*, 419 U.S. at 607, 95 S.Ct. 719 (describing the affidavit as containing only "conclusory allegations"); *Fuentes*, 407 U.S. at 83, 92 S.Ct. 1983 (describing the affidavit as "alleg[ing] conclusorily that he is entitled to specific goods"). In contrast, a sworn affidavit affords greater protection when it pertains to "ordinarily uncomplicated matters that lend themselves to documentary proof" such as the creditor/debtor relationship in *Mitchell*, 416 U.S. at 609, 94 S.Ct. 1895.

As stated previously, § 34–28–4(b) requires that the notice of intention must be executed under oath and contain: (1) the name of the property owner; (2) "[a] general description of the land sufficient to identify it"; (3) "[a] general description of the nature of the work done or * * * materials furnished" (or to be done or furnished) and "the approximate value thereof * * * "; (4) the name and address of the person for whom the work was, or is to be done, or materials furnished; (5) the "name and address of the person mailing the notice" or his or her agent for purposes of the notice and underlying lien claimed; and (6) a statement that the person so mailing "has not been paid for the work done or materials furnished." A review of the notice of intention form provided in the statute leads us to conclude it is a detailed, but mostly conclusory, sworn affidavit. *See* § 34–28–4(c) (form). Even so, this factor weighs slightly in favor of constitutionality.

The statute offers two ancillary procedural safeguards further limiting the risk of erroneous deprivation. First, § 34–28–19 grants the Superior Court the express power to grant a prevailing party "reasonable expenses" including "legal interest, costs of advertising" and "attorneys' fees." Thus, claimants who use the statute for reasons other than to secure payment for work done should be dissuaded from doing so by the threat of pecuniary loss.

Second, § 34–28–17 allows the property owner to pay cash into or post a bond with the court registry to release the lien and regain clear title to the property. Although we agree with the motion justice that the release of the lien in this way does not render the property owner's deprivation insignificant, we do not think the provision is irrelevant to our inquiry; the possibility of promptly clearing title does minimize the risk of erroneous deprivation. The effect of a clouded title during a time-sensitive sale of real property is much more coercive than a cash payment or the posting of a bond. A property owner, by unilaterally clearing title with a bond or cash payment, can thwart those potentially coercive effects. The claimant's knowledge of § 34–28–17 limits erroneous deprivation.

### iii

### Procedural Safeguards Afforded by Other Prejudgment Remedy Statutes

The prejudgment remedy statutes analyzed by the United States Supreme Court have afforded other procedural safeguards not included in the amended Mechanics' Lien Law: a showing of extraordinary circumstances and *ex parte* judicial scrutiny of an affidavit before the lien is perfected. We briefly discuss these safeguards to determine the probable value of additional due process protection.

The United States Supreme Court's caselaw on extraordinary circumstances (sometimes referred to as exigent circum-

stances) is without a doubt the most confusing aspect of the law in this area.[26] In any case, this Court's interpretation of the procedural due process cases is that under the current *Mathews–Doehr* balancing test, extraordinary circumstances is simply a factor, and thus, not required, or, in the alternative, the particulars of the situation giving rise to mechanics' liens is a per se extraordinary circumstance.[27] The first

**26.** Perhaps the best example of this confusion is the comparison of *Mitchell* with the *Sniadach/Fuentes* cases. In striking down Wisconsin's garnishment statute, the *Sniadach* Court acknowledged that "[s]uch summary procedure may well meet the requirements of due process in extraordinary situations." *Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337, 339, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Likewise the *Fuentes* Court noted that the statutes struck down in that case did not "limit the summary seizure of goods to special situations demanding prompt action [such as where] a creditor could make a showing of immediate danger that a debtor will destroy or conceal disputed goods." *Fuentes*, 407 U.S. at 93, 92 S.Ct. 1983.

Nonetheless, the *Mitchell* Court upheld a Louisiana sequestration law that required *no* showing of extraordinary circumstances. *Mitchell*, 416 U.S. at 605 n. 4, 94 S.Ct. 1895 (noting that under the statute in question "the apprehension of the creditor is no longer the issue, and the writ may be obtained when the goods are within the power of the debtor"). The *Mitchell* Court took pains to limit *Sniadach* and *Fuentes* to their facts. *See Mitchell*, 416 U.S. at 614–15, 94 S.Ct. 1895. Conspicuously absent from the *Mitchell* opinion is any explicit discussion of the presence or lack thereof of extraordinary circumstances.

The subsequent cases merely have added to this conundrum. *North Georgia Finishing, Inc. v. Di–Chem, Inc.*, 419 U.S. 601, 607, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), does not mention extraordinary circumstances whatsoever, preferring more of a comparative approach in its holding that "[t]he Georgia garnishment statute has none of the saving characteristics of the Louisiana statute" upheld in *Mitchell*. *See also Di–Chem, Inc.*, 419 U.S. at 614, 95 S.Ct. 719 (Blackmun, J. dissenting) (noting the Court did "little more than make very general and very sparse comparisons"). In contrast, the *Doehr* Court, breathed new life—and new confusion—into the extraordinary circumstances issue within its first paragraph. *Doehr*, 501 U.S. at 4, 111 S.Ct. 2105. However, the *Doehr* Court did not expressly state that ex-

traordinary circumstances *were required* in prejudgment remedy cases, nor did the Court do anything to clarify the definition of the term. At the same time, *Doehr* did nothing to otherwise limit *Mitchell*, except perhaps to note that the dispute in *Doehr* was less susceptible to uncomplicated documentary proof and that the *Doehr* plaintiffs did not have a preexisting interest as the claimant had in *Mitchell*. *See Doehr*, 501 U.S. at 14, 16, 111 S.Ct. 2105.

**27.** As noted in the text, *Doehr* seems to indicate that, at least in the case of mechanics' liens, either no extraordinary circumstances are required, or that the mechanics' lien situation is per se an extraordinary circumstance. Two points are central to both interpretations. First, the *Doehr* Court cited to *Mitchell* as an extraordinary circumstances case when it noted that

"there was no allegation that Doehr was about to transfer or encumber his real estate or take any other action during the pendency of the action that would render his real estate unavailable to satisfy a judgment. Our cases have recognized such a properly supported claim would be an exigent circumstance permitting postponing any notice or hearing until after the attachment is effected." *Doehr*, 501 U.S. at 16, 111 S.Ct. 2105.

However, the *Mitchell* case made no reference to extraordinary circumstances as an aspect of due process beyond noting that the statute in question did not require any such showing. *Mitchell*, 416 U.S. at 605 n. 4, 94 S.Ct. 1895. As such, the only reasonable interpretation is that the *Doehr* Court was referring to the threat of loss to the *Mitchell* claimant's preexisting interest in the property *as a kind of extraordinary circumstance*. If this is a correct reading of *Doehr*, it seems that, absent a properly perfected lien, a claimant—who cannot remove the value of labor or materials added to a property—faces the same risk of loss to a bona fide purchaser.

In addition, the *Doehr* Court's statement about an "alternative basis for affirmance" of *Spielman–Fond, Inc.*, indicates that perhaps

interpretation is based on the fact that the *Mitchell* case upheld a Louisiana sequestration statute that did *not require extraordinary circumstances*. *See generally Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). The second interpretation is based on *Doehr's* statement that *"Spielman–Fond* presented an alternative basis for affirmance in any event" because "the mechanic[s'] lien statute in *Spielman–Fond* required the creditor to have a pre-existing interest in the property at issue * * * [that] in certain circumstances can provide a ground for upholding procedures that are otherwise suspect." *Doehr*, 501 U.S. at 12 n. 4, 111 S.Ct. 2105.

*Ex parte* judicial scrutiny of the affidavit before the lien is filed has been treated differently at different times by the United States Supreme Court. The *Mitchell* Court placed significant reliance on that safeguard in upholding the sequestration statute. *Mitchell*, 416 U.S. at 616–17, 94 S.Ct. 1895. In contrast, the *Doehr* Court stated the judicial review of "factual allegations that were sufficient to state a cause of action but which the defendant would dispute" presents a great "potential for unwarranted attachment," because "the judge could make no realistic assessment concerning the likelihood of an action's success based upon these one-sided, self-serving, and conclusory submissions." *Doehr*, 501 U.S. at 13–14, 111 S.Ct. 2105.

Accordingly, the likelihood is minimal that *ex parte* judicial scrutiny of an affidavit before perfecting the lien would decrease the risk of erroneous deprivation.

To summarize our analysis of the second *Mathews–Doehr* prong, despite the lack of a showing of extraordinary circumstances and *ex parte* judicial review of the affidavit, the procedural safeguards that the statute employs, primarily the prompt post-deprivation hearing, limits the risk of erroneous deprivation.

3

### Gem's Interest and "Due Regard" for Rhode Island's Interest

■ The third prong of the *Mathews–Doehr* test examines Gem's interests, with due regard given to any ancillary interest the government may have in providing or forgoing additional protections. *Doehr*, 501 U.S. at 11, 111 S.Ct. 2105. The *Doehr* Court stressed that the tort claimant in that case had no actual interest in the attached property. "His only interest in attaching the property was to ensure the availability of assets to satisfy his judgment if he prevailed on the merits * * *." *Id.* at 16, 111 S.Ct. 2105. Along similar lines, the motion justice hastily treated Gem's interest in this case in a single sentence: "while a potential claimant certainly has an interest in getting paid; that claimant, like all others, can suffer through

mechanics' liens either present an extraordinary circumstance or that such a circumstance is not required. *See Doehr*, 501 U.S. at 12 n. 4, 111 S.Ct. 2105. The critical footnote states: "[t]he facts of *Spielman–Fond*, presented an alternative basis for affirmance in any event. Unlike the case before us, the mechanic[s'] lien statute in *Spielman–Fond* required the creditor to have a pre-existing interest in the property at issue * * * a heightened plaintiff interest in certain circumstances can provide a ground for upholding procedures that are otherwise suspect." *Id.*

A cursory review of the original *Spielman–Fond, Inc.* case (which was cursory itself) shows the case was a run-of-the-mill mechanics' lien situation. No extraordinary circumstances were alleged. The claimants simply alleged that they had not been paid. *Spielman–Fond, Inc.*, 379 F.Supp. at 997. Accordingly, either the United States Supreme Court considers the mechanics' lien situation some sort of extraordinary situation, or, alternatively, no such showing is required.

the constitutionally-required exercise of a hearing * * *."

In his *Doehr* concurrence, Chief Justice Rehnquist compellingly distinguished the *Doehr* situation from one involving a mechanic's lien, while stressing the importance of the claimant's preexisting interest in the real property subject to lien.

"[I]n *Spielman–Fond, Inc.,* * * * there was * * * an alternative basis available to this Court for affirmance of that decision. *Arizona recognized a pre-existing lien in favor of unpaid mechanics and materialmen who had contributed labor or supplies which were incorporated in improvements to real property.* The existence of such a lien upon the very property ultimately posted or noticed distinguishes those cases from the present one, where the plaintiff had no preexisting interest in the real property which he sought to attach. Materialmen's and mechanic's lien statutes award an interest in real property to workers who have contributed their labor, and to suppliers who have furnished material, for the improvement of the real property. Since neither the labor nor the material can be reclaimed once it has become a part of the realty, this is the only method by which workmen or small businessmen who have contributed to the improvement of the property may be given a remedy against a property owner who has defaulted on his promise to pay for the labor and the materials. To require any sort of a contested court hearing or bond before the notice of lien takes effect would largely defeat the purpose of these statutes." *Doehr,* 501

U.S. at 28, 111 S.Ct. 2105 (emphasis added).

Like the Arizona statute referenced by Chief Justice Rehnquist, the Rhode Island Mechanics' Lien Law recognizes a preexisting interest in claimants who, through their hard work and materials, increase the value of an owner's property while having no means later to undo the improvement. As noted above,[28] § 34–28–1(a) makes any improvement and the land upon which the improvement sits "liable and * * * subject to liens for all the work done by any person * * * [as well as] for the materials used" in the doing of any such improvement.

■ This Court's interpretation of the statute (and its predecessors)—for more than a century—has been that the mechanic's lien "comes into existence when the work begins or the materials are furnished." *Art Metal Construction Co.,* 56 R.I. at 235, 185 A. at 140. "It is not acquired by an adverse proceeding after the debt has been incurred, but it accrues as the debt accrues, being incident to the improvement, and therefore the owner of the estate to which it attaches consents to it when he consents to the improvement." [29] *Id.* at 235–36, 185 A. at 140 (quoting *Briggs v. Titus,* 13 R.I. 136, 138 (1880)).

The First, Second and Tenth Circuits have acknowledged the preexisting interest theory in post-*Doehr* cases. *See Shaumyan v. O'Neill,* 987 F.2d 122, 127–28 (2d Cir.1993) (noting in its prong three analysis that when the claimants in that case pursued prejudgment attachment based on a contract action, nonetheless, "even

---

28. *See supra* Part II.B.

29. The Rossis argue that there is an unfounded assumption that a claimant necessarily *adds* value to the property. In light of *Art Metal Construction Co.,* this argument fails. Although the precise amount, if any, owed to a claimant is a question that in the end will be resolved at trial under contract principles, there is usually *some* value in the work performed—even if it is not the face value of the alleged debt.

though [the claimant] failed to file and perfect a mechanic's lien, [the claimant's] unperfected lien nonetheless constituted an interest in the [the property owners'] real property"); *Cobb v. Saturn Land Co.,* 966 F.2d 1334, 1337 (10th Cir.1992) (citing *Doehr* for the proposition that unpaid claimants, under an Oklahoma statute, "*already possess[ed]* an oil and gas lien before anything is ever filed for purposes of implementation and enforcement"); *Reardon v. United States,* 947 F.2d 1509, 1521–22 (1st Cir.1991) (en banc) (distinguishing a statutory lien pursuant to the Comprehensive Environmental Response; Compensation, and Liability Act, from mechanics' liens because, unlike those claimants, the EPA had no recognized preexisting interest in the Reardons' property). Likewise, state courts have also recognized the preexisting interest cited in *Doehr.* See *Red Rooster Construction Co. v. River Associates, Inc.,* 224 Conn. 563, 620 A.2d 118, 124 (1993) (citing *Doehr* for the proposition that "mechanic's lien statutes serve to protect *creditors'* preexisting interests in the property at issue"); *Haimbaugh Landscaping, Inc. v. Jegen,* 653 N.E.2d 95, 110 (Ind.Ct.App.1995) (noting that "*Doehr* makes clear that [claimants] have a 'preexisting' or a 'heightened' interest"). Clearly, after *Doehr,* no analysis of the constitutionality of mechanics' liens is complete without a discussion of a claimant's preexisting interest in the real property improved by his labor.[30]

Finally, we address the State's interest in the Mechanics' Lien Law. In *Doehr,* the

United States Supreme Court noted that "[n]o interest the government may have affects the analysis. The State's interest in protecting any rights of the plaintiff cannot be any more weighty than those rights themselves." *Doehr,* 501 U.S. at 16, 111 S.Ct. 2105. In contrast, given Gem's significant preexisting lien, the State's interest in providing a protective mechanism is indeed "weighty." The statute itself represents a kind of balancing of competing property interests, as well as a policy choice intended to encourage construction. See *AMI Operating Partners Limited Partnership v. JAD Enterprises, Inc.,* 77 Md.App. 654, 551 A.2d 888, 893 (Spec.App.1989) (noting that " 'mechanics' lien statutes, in an endeavor to provide for the public welfare, are designed to encourage construction by ensuring that those who contribute to a project are compensated for their efforts' ").

In terms of forgoing additional procedures,[31] the State has an additional interest in putting potential purchasers on notice of all claims to prevent the type of complex third-party disputes that inevitably would result from transfers of such property. Cf. *New Destiny Development Corp. v. Piccione,* 802 F.Supp. 692, 698 n. 9 (D.Conn.1992) (discussing Connecticut's interest in its lis pendens statute). Recognizing that properties often change hands several times in development, the mechanics' lien statute provides a swift means for a claimant to preserve his or her interest relative to subsequent bona fide purchasers.[32]

---

30. In upholding the constitutionality of Louisiana's sequestration statute, the *Mitchell* Court found significant the preexisting interest of the claimants, noting that, based on that interest and the risk of deteriorated value to consumer goods by continued use in the hands of the property owner, the state "was entitled to recognize this reality and to provide somewhat more protection for the seller." *Mitchell,* 416 U.S. at 608, 94 S.Ct. 1895.

31. We note that the administrative burden of additional procedures is unlikely to greatly exceed any judicial and administrative burden inherent in § 34–28–17.1's show-cause procedures.

32. The State also has an interest in the constitutionality of the Mechanics' Lien Law to the extent that a holding to the contrary would render other statutory prejudgment liens con-

Accordingly, we hold that Gem's preexisting interest in the property and the State of Rhode Island's ancillary interest weigh strongly in favor of constitutionality.

## Conclusion

■ Giving due consideration to all three prongs of the *Mathews–Doehr* balancing test, we conclude that the Mechanics' Lien Law, as amended by § 34–28–17.1, does not violate the Due Process Clauses of the Fourteenth Amendment to the United States Constitution or Article 1, Section 2 of the Rhode Island Constitution. Tipping the scales in favor of constitutionality is the combination of the claimant's statutory preexisting interest in the property and the availability of a prompt post-deprivation hearing. The claimant's preexisting interest is especially weighty when compared with the property owner's interest in a clear title, the deprivation of which was not a "temporary total deprivation." Also, the property owner's access to a prompt post-deprivation hearing pursuant to § 34–28–17.1, when combined with the other procedural safeguards afforded by the statute, limits the risk of erroneous deprivation. In light of the presumption of constitutionality required by the applicable standard of review, we hold that the Rhode Island Mechanics' Lien Law, chapter 28 of title 34, is constitutional.[33]

Once again, it is necessary to restate our more than seventy-year-old concerns about the Rhode Island Mechanics' Lien Law.

This Court consistently has noted that the statute lacks clarity, not merely to empathize with local practitioners and judges who struggle with its complexity, but rather with the hope that our Legislature would rewrite the statute so that all could read it, comprehend it and apply it without continually turning to this Court. Our descriptions of provisions of the statute as "a single sentence of gargantuan [and now Brobdingnagian] length" have fallen on deaf ears. *Faraone*, 413 A.2d at 91. Pleas for clarity from members of the bar have not produced results. *See* Christopher H. Little, *The Rhode Island Mechanics' Lien Law: A Plea (and Proposal) for Clarity and Fairness*, 3 Roger Williams U.L. Rev. 207 (1998). In fact, even amended § 34–28–17.1(a)(1) lacks clarity. A more plainly written and user-friendly statute would benefit all involved. Thus, our holding that the statute passes constitutional muster should not be read as an endorsement of the statute in its current form.

For the reasons stated herein and because the motion justice did not have an opportunity to review the Mechanics' Lien Law as amended by § 34–28–17.1, we vacate the judgment of the Superior Court. The record shall be remanded to the Superior Court.

---

stitutionally suspect—a situation that arguably might lead to chaos in the marketplace. The Legislature has created a number of such liens including tax liens on real property, G.L.1956 § 44–9–1; attorney's liens, G.L. 1956 § 9–3–1; hospital liens, § 9–3–4; and motor vehicle repairer's liens, § 9–3–9, as well as a multitude of others too numerous to list here.

33. Although we uphold the constitutionality of the statute as written, we recognize that additional procedural safeguards would further limit the risk of erroneous deprivation. The Legislature, in its policymaking role, is free to enact additional procedural safeguards should it determine any are prudent. Our analysis of constitutionality is not a determination of what is, and what is not, sound policy.